Application of Malcolm E. BERGY, John H. Coats, and Vedpal S. Malik.

Application of Ananda M. CHAKRABARTY.

Appeal Nos. 76–712, 77–535.

United States Court of Customs and Patent Appeals.

March 29, 1979.

See also, Cust. and Pat.App., 571 F.2d 40.

Roman Saliwanchik, Kalamazoo, Mich., for appellants; Malcolm E. Bergy, John H. Coats, and Vedpal S. Malik, John Kekich, Kalamazoo, Mich., of counsel.

Leo I. MaLossi, Schenectady, N. Y., for appellant Ananda M. Chakrabarty; Joseph B. Forman, Arlington, Va., Joseph T. Cohen, Schenectady, N. Y., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents and Trademarks; Gerald H. Bjorge, Washington, D. C., of counsel.

Donald L. Reidhaar, Berkeley, Cal., Mary Helen Sears, Lorance L. Greenlee, Washington, D. C., Iron & Sears, Washington, D. C., for amicus curiae, The Regents of the University of California.

Tom Arnold, Houston, Tex., Arnold, White & Durkee, Houston, Tex., for amicus curiae, the American Patent Law Association; William F. Eberle, Bruce M. Collins, New York City, Karl F. Jorda, Ardsley, N. Y., Bernard F. Leon, Nutley, N. J., Donald R. Dunner, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE, and MILLER, Judges.

RICH, Judge.

## Introduction

These appeals are from decisions of the Board of Appeals (board) of the United States Patent and Trademark Office (PTO) under 35 U.S.C. § 141 by dissatisfied applicants for patents. We reverse.

These two cases come before us for the second time under the circumstances hereinafter detailed. Since our first decisions, they have been to the United States Supreme Court and back without any decision by that Court. They are separate appeals, not formally consolidated, but on this second round they were heard together on November 6, 1978, and are now decided together because, as will appear, they involve only the same single question of law.

The question before us is a limited one of statutory construction, not whether appellants have made and disclosed *patentable* inventions. The PTO has already determined that both applicants are entitled to patents; in technical patent law terms, unappealed claims to their respective inventions have been allowed to each appellant and, whatever the final disposition of these appeals, patents will issue if the applicants choose to pay their fees and take them out. Thus, there is no question of this court having "extended the scope of the patent laws" as the *Bergy* petition for certiorari asserted (p. 6). Deciding a case of first impression is not necessarily an "extension" of the law, it is a determination of what it means.

The real question before us is whether appellants are to be allowed to define their inventions—already determined to be patentable—in a certain way in "claims" pursuant to 35 U.S.C. § 112, second paragraph.[1] This question, which is the same in each case, involves the construction and application of 35 U.S.C. § 101, more particularly the meaning to be given to the words "man-

---

1. Insofar as applicable, § 112 reads:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

ufacture" and "composition of matter" in that section, which reads:

> Whoever invents or discovers any new and useful process, machine, *manufacture, or composition of matter,* or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. [Emphasis ours.]

The PTO has raised no issue in either case, as to any aspect of the inventions, about compliance with the "conditions and requirements of this title," that is to say the basic Title 35 requirements for patentability, which are utility, novelty, and nonobviousness (35 U.S.C. §§ 101, 102, and 103), or any other statutory condition or requirement such as adequacy of disclosure (35 U.S.C. § 112, first paragraph). The sole issue, as the PTO chooses to view it, is whether an invention, otherwise patentable under the statute, is excluded from the categories of. subject matter which may be patented, set forth in § 101, because it is "alive." As we shall show, the PTO does not appear to us to have been altogether consistent in its position on this question. First, however, we review the history of this litigation to show the posture of the cases as they are now before us again.

### Procedural Background

*In re Bergy,* 563 F.2d 1031, 195 USPQ 344 (Cust. & Pat.App.1977), *vacated sub nom. Parker v. Bergy,* 438 U.S. 902, 98 S.Ct. 3119, 57 L.Ed.2d 1145 (June 26, 1978), 198 USPQ 257 (1978), hereinafter *"Bergy,"* was decided by us October 6, 1977. We reversed a 2-to-1 decision of the board, 197 USPQ 78 (Bd.App.1976), which affirmed the final rejection by the PTO examiner of claim 5 of Bergy's application for patent serial No. 477,766, filed June 10, 1974.

The real party in interest in *Bergy* is the assignee of the application, The Upjohn Company, Kalamazoo, Michigan.

*In re Chakrabarty,* 571 F.2d 40, 197 USPQ 72 (Cust. & Pat.App.), *cert. dismissed,* —— U.S. ——, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978), hereinafter *"Chakrabarty,"* was decided by us March 2, 1978. We reversed the decision of the board (unreported) which affirmed the final rejection by the PTO examiner of claims 7–9, 13, 15, 17, 21, and 24–26 of Chakrabarty's application for patent serial No. 260,563, filed June 7, 1972.

The real party in interest in *Chakrabarty* is the assignee of the application, General Electric Company.

In the PTO, *Chakrabarty* was the first of the two cases to be decided, the decision of the board being dated May 20, 1976. An entirely different panel of the board decided *Bergy* on June 22, 1976, one member dissenting with an extensive opinion. A long passage of the *Chakrabarty* board opinion was copied verbatim by the *Bergy* board majority. Due to delay caused by a request for reconsideration in the PTO in *Chakrabarty,* the *Bergy* appeal was the first to reach this court.

Having decided the sole question involved in *Bergy,* by our opinion dated October 6, 1977, when the identical question was presented to us in *Chakrabarty* in December of that year, we decided it on the basis of our *Bergy* decision as a controlling precedent in this court. Our opinion in *Chakrabarty* was published March 2, 1978.

On April 20, 1978, a petition for a writ of certiorari in *Bergy* was filed in the Supreme Court by the Solicitor General on behalf of Lutrelle F. Parker, Acting Commissioner of Patents and Trademarks. The Court granted the petition June 26, 1978, and on the same day issued the following order:

> THIS CAUSE having been submitted on the petition for writ of certiorari and response thereto,
>
> ON CONSIDERATION WHEREOF, it is ordered and adjudged by this Court that the judgment of the United States Court of Customs and Patent Appeals in this cause is vacated; and that this cause is remanded to the United States Court of Customs and Patent Appeals for further consideration in light of *Parker v. Flook,* 437 U.S. 584 [98 S.Ct. 2522, 57 L.Ed.2d 451] (1978). [198 USPQ 193.]

*Parker v. Flook*, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451, 198 USPQ 193 (1978), hereinafter "*Flook*", was a case from this court (*In re Flook*, 559 F.2d 21, 195 USPQ 9 (Cust. & Pat.App.1977), *reversed sub nom. Parker v. Flook*, supra), involving a computerized method of updating alarm limits by application of a mathematical formula. It was decided by the Supreme Court, three Justices dissenting, on June 22, 1978, four days before the date of the foregoing order in *Bergy*.

Meanwhile, in *Chakrabarty*, an extension of time to file a petition for a writ of certiorari requested by the Solicitor General had been granted by the Chief Justice on May 26, 1978, extending the time to July 30, 1978. The petition, No. 78–145, was filed on July 26, 1978.

August 3, 1978, the Commissioner of Patents and Trademarks, by his solicitor, petitioned this court to vacate its decision in *Chakrabarty*, recall its mandate, and enter a new decision affirming the PTO board in view of the Supreme Court's order in *Bergy*. The solicitor argued that the action taken in *Parker v. Flook* showed that our decision in *Chakrabarty* "was demonstrably wrong." Chakrabarty, on August 11, opposed the petition, pointing out that in the Supreme Court's order in *Bergy* "there is no hint that this Court's decisions in *Bergy* and *Chakrabarty* were 'demonstrably wrong'." We granted the petition to the extent of vacating our judgment.

Perceiving the foregoing situation and being mindful of the similarities as well as the differences of the *Bergy* and *Chakrabarty* cases and of the fact they involved the same single issue, we issued orders in *Bergy* on August 8 and in *Chakrabarty* on August 11, 1978, restoring both cases to the calendar, setting times for filing supplementary briefs directed solely to the effect, if any, of *Parker v. Flook* on our decisions, and setting the cases for hearing together on November 6, 1978.

Counsel for Chakrabarty and the Solicitor General then stipulated, pursuant to Rule 60(1) of the Supreme Court, that Chakrabarty's petition for a writ of certiorari be dismissed in view of this court's order vacating our judgment and recalling our mandate, and the petition was so dismissed on August 25, 1978.

Prior to the oral argument, this court received amicus curiae briefs on behalf of The Regents of the University of California, The American Patent Law Association, Genentech, Inc. (a California Corporation located in South San Francisco), and Cornell D. Cornish, patent attorney, on behalf of himself and the Village of Belle Terre, Long Island, New York.

The Genentech brief, furthermore, called to our attention three resolutions, Nos. 30–32, adopted by the Section of Patent, Trademark and Copyright Law of the American Bar Association at its August 1978 Annual meeting directed to the issue in these appeals and supportive of our prior decisions herein. (1978 Summary of Proceedings, Section of Patent, Trademark and Copyright Law, A.B.A. 31.)

Appellants in both cases and the PTO appeared by counsel on November 6, 1978, and presented oral argument, whereupon the appeals were resubmitted for new decisions.

*Present Posture of the Cases Summarized*

In *Bergy* our judgment of October 6, 1977, was vacated by the Supreme Court on certiorari and we were directed to reconsider the case in the light of *Flook*. In *Chakrabarty*, because the identical issue was involved, we vacated our own March 2, 1978, decision at the request of the PTO because it was obviously necessary to give it the same reconsideration. We therefore approach both cases with the slate wiped clean, having been "returned to square one," to use a board game expression. Whatever we have to say in these cases is said here, though much of it was said before, and our prior opinions are to be deemed withdrawn. While certiorari was granted in *Bergy*, that case was returned to us without having been briefed or argued before the Supreme Court, on the very day that certiorari was granted, at the end of the Court's term, and within four days of

the decision in *Flook*, to be reconsidered by us in the light of the High Court's opinion in *Flook*. The Court gave no intimation of what bearing it thought *Flook* has on the single issue in these appeals, except as it may be gleaned from the *Flook* opinion.

Clearly, our assigned task is first to determine the bearing of *Flook*, if any, on these two appeals. This requires, as we see it, consideration not only of what was *decided* in *Flook* but examination of everything that was said in the opinion. Preliminary to that consideration, however, and laying the groundwork therefor, we will examine the Constitutional basis for the patent system and the anatomy of the statutes Congress has enacted insofar as they are relevant to the problem before us.

### The Constitution

The grant of power to Congress to establish a patent system is in these familiar words of Article I, section 8, clauses 8 and 18:

> [The Congress shall have Power] * *
> [8] To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries; * * * [And]
> [18] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * *.

Scholars who have studied this provision, its origins, and its subsequent history, have, from time to time, pointed out that it is really two grants of power rolled into one; first, to establish a copyright system and, second, to establish a patent system. *See* R. DeWolf, *An Outline of Copyright Law* 15 (1925); K. Lutz, *Patents and Science. A Clarification of the Patent Clause of the Constitution*, 18 Geo.Wash.L.Rev. 50 (1949); P. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. § 1 to § 110, 1, 3 (1954); G. Rich, *Principles of Patentability*, 28 Geo.Wash.L.Rev. 393 (1960). Their conclusions have been that the constitutionally-stated purpose of granting patent rights to inventors for their discoveries is the promotion of progress in the "useful Arts," rather than in science. In enacting the 1952 Patent Act, both houses of Congress adopted in their reports this construction of the Constitution in identical words, as follows:

> The background, the balanced construction, and the usage current then and later, indicate that the constitutional provision is really two provisions merged into one. The purpose of the first provision is to promote the progress of *science* by securing for limited times *to authors* the exclusive right to their *writings*, the word "science" in this connection having the meaning of knowledge in general, which is one of its meanings today. The other provision is that Congress has the power to promote the *progress of useful arts* by securing for limited times to *inventors* the exclusive right to their *discoveries.* The first patent law and all patent laws up to a much later period were entitled "Acts to promote the progress of useful arts." [H.R.Rep.No.1923, 82d Cong., 2d Sess. 4 (1952); S.Rep.No.1979, 82d Cong., 2d Sess. 3 (1952), U.S.Code Cong. & Admin.News 1952, pp. 2394, 2396. Emphasis ours.]

It is to be observed that the Constitutional clause under consideration neither gave to nor preserved in inventors (or authors) any rights and set no standards for the patentability[2] of individual inventions; it merely empowered Congress, if it elected to

2. We use the term "patentability" although the Constitution does not mention patents because history shows that the authors of the Constitution had patents in mind as the means for securing exclusive rights to inventors. They had been in use in the American colonies and the practice had been imported from England. *See* B. Bugbee, *The Genesis of American Patent and Copyright Law*, Chap. VI (1967). The only restraints placed on Congress pertained to the means by which it could promote useful arts, namely, through the device of securing "exclusive rights" which were required to be limited in time, a device known to governments for centuries. The conditions to be imposed on the granting of such rights, which have varied through the years, were left to Congress to devise. *Graham v. John Deere Co.*, 383 U.S. 1, 6, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

do so, to secure to inventors an "exclusive right"[3] for an unstated "limited" time for the stated purpose of promoting useful arts. We have previously pointed out that the present day equivalent of the term "useful arts" employed by the Founding Fathers is "technological arts." *In re Musgrave*, 431 F.2d 882, 893, 57 CCPA 1352, 1367, 167 USPQ 280, 289–90 (1970). *See also In re Waldbaum*, 457 F.2d 997, 59 CCPA 940, 173 USPQ 430 (1972) (Rich, J., *concurring*).

We turn now to a consideration of how Congress has implemented the power delegated to it.

### Anatomy of the Patent Statute

The reason for our consideration of the statutory scheme in relation to its Constitutional purpose is that we have been directed to review our prior decisions in the light of *Flook* and we find in *Flook* an unfortunate and apparently unconscious, though clear, commingling of distinct statutory provisions which are conceptually unrelated, namely, those pertaining to the *categories* of inventions in § 101 which *may* be patentable and to the *conditions* for patentability demanded by the statute for inventions within the statutory categories, particularly the nonobviousness condition of § 103. The confusion creeps in through such phrases as "eligible for patent protection," "patentable process," "new and useful," "inventive application," "inventive concept," and "patentable invention." The last-mentioned term is perhaps one of the most difficult to deal with unless it is used *exclusively* with reference to an invention which complies with *every* condition of the patent statutes so that a valid patent may be issued on it.

The problem of accurate, unambiguous expression is exacerbated by the fact that prior to the Patent Act of 1952 the words "invention," "inventive," and "invent" had distinct legal implications related to the concept of patentability which they have not had for the past quarter century. Prior to 1952, and for sometime thereafter, they were used by courts as imputing *patentability*. Statements in the older cases must be handled with care lest the terms used in their reasoning clash with the reformed terminology of the present statute; lack of meticulous care may lead to distorted legal conclusions.

The transition made in 1952 was with respect to the old term "invention," imputing *patentability*, which term was replaced by a new statutory provision, § 103, requiring *nonobviousness*, as is well explained and approved in *Graham v. John Deere Co.*, supra n. 2. Part IV of that opinion, entitled "The 1952 Act," quotes the key sections of the statute upon which patentability depends. *Graham* states that there are three explicit conditions, novelty, utility, and nonobviousness, which is true, but there is a fourth requirement, which alone, is involved here. This was also the sole requirement involved in *Flook.*

The Revised Statutes of 1874, which contained the primary patent statutes revised and codified in 1952, lumped most of the conditions for patentability in a single section, § 4886, as did all of the prior statutes back to the first one of 1790. The 1952 Act divided that statute up into its logical components and *added* the nonobviousness requirement, which until then had been imposed only by court decisions. This attempt

---

3. The term "exclusive right" is one which caused much confusion in thinking throughout much of the early history of patent law, at least until 1852 when the Supreme Court decided *Bloomer v. McQuewan*, 14 How. 539, 55 U.S. 539, 14 L.Ed. 532, wherein it pointed out (14 How. p. 548, 55 U.S. p. 548) that

The franchise which the patent grants, consists altogether in the *right to exclude* everyone from making, using, or vending the thing patented, without the permission of the patentee. *This is all that he obtains by the patent.* [Emphasis ours.]

Confusion persisted, however, principally for the reason that until 1952 the patent statute phrased the patent grant, Revised Statutes § 4884, as "the *exclusive right* to make, use, and vend the invention * * *." [Emphasis ours.] The patent grant never has had anything to do with the patentee's right to make, use, or vend, and the 1952 Act clarified the right to conform to *Bloomer v. McQuewan.* 35 U.S.C. § 154.

at a clearcut statement to replace what had been a hodgepodge of separate enactments resulted in a new and official Title 35 in the United States Code with three main divisions. Part I pertains to the establishment and organization of the PTO. Part II, here involved, covers patentability of inventions and the grant of patents. Part III relates to issued patents and the protection of the rights conferred by them.

All of the statutory law relevant to the present cases is found in four of the five sections in Chapter 10, the first chapter of Part II:

Sec. 100 Definitions
Sec. 101 Inventions patentable [if they qualify]
Sec. 102 Conditions for patentability; novelty and loss of right to patent
Sec. 103 Conditions for patentability; non-obvious subject matter

More strictly speaking, these cases involve only § 101, as did *Flook*. Achieving the ultimate goal of a patent under those statutory provisions involves, to use an analogy, having the separate keys to open in succession the three doors of sections 101, 102, and 103, the last two guarding the public interest by assuring that patents are not granted which would take from the public that which it already enjoys (matters already within its knowledge whether in actual use or not) or *potentially* enjoys by reason of obviousness from knowledge which it already has.

Inventors of patentable inventions, as a class, are those who bridge the chasm between the known and the obvious on the one side and that which promotes progress in useful arts or technology on the other.

The first door which must be opened on the difficult path to patentability is § 101 (augmented by the § 100 definitions), quoted supra p. 956.[4] The person approaching that door is *an inventor,* whether his invention is patentable or not. There is always an inventor; being an inventor might be regarded as a preliminary legal require-

ment, for if he has not invented something, if he comes with something he knows was invented by someone else, he has no right even to approach the door. Thus, section 101 begins with the words "Whoever invents or discovers," and since 1790 the patent statutes have always said substantially that. Being an inventor or having an invention, however, is no guarantee of opening even the first door. What *kind* of an invention or discovery is it? In dealing with the question of kind, as distinguished from the qualitative conditions which make the invention patentable, § 101 is broad and general; its language is: "any * * * process, machine, manufacture, or composition of matter, or any * * * improvement thereof." Section 100(b) further expands "process" to include "art or method, and * * * a new use of a known process, machine, manufacture, composition of matter, or material." If the invention, as the inventor defines it in his claims (pursuant to § 112, second paragraph), falls into any one of the named categories, he is allowed to pass through to the second door, which is § 102; "novelty and loss of right to patent" is the sign on it. Notwithstanding the words "new and useful" in § 101, the invention is not examined under that statute for novelty because that is not the statutory scheme of things or the long-established administrative practice.

■■■ Section 101 *states* three requirements: novelty, utility, and statutory subject matter. The understanding that these three requirements are *separate and distinct* is long-standing and has been universally accepted. The text writers are all in accord and treat these requirements under separate chapters and headings. *See, e. g., Curtis's Law of Patents,* Chapters I and II (1873); 1 *Robinson on Patents* §§ 69–70 at 105–109 (1890); 1 *Rogers on Patents* (1914); Revise & Caesar, *Patentability and Validity,* Chapters II, III, IV (1936); *Deller's Walker on Patents,* Chapters II, IV, V (1964). Thus, the questions of whether a

---

4. The Supreme Court has directed that the determination that statutory subject matter under § 101 exists "must precede" the inquiries under

§§ 102–103. *Parker v. Flook,* supra, 437 U.S. at 593, 98 S.Ct. 2522, 198 USPQ at 198–199.

particular invention is *novel* or *useful* are questions wholly apart from whether the invention falls into a category of *statutory subject matter.* Of the three requirements *stated* in § 101, only two, utility and statutory subject matter, are *applied* under § 101. As we shall show, in 1952 Congress voiced its intent to consider the novelty of an invention under § 102 where it is first made clear what the statute means by "new", notwithstanding the fact that this requirement is first *named* in § 101.

The PTO, in administering the patent laws, has, for the most part, consistently applied § 102 in making rejections for lack of novelty. To provide the option of making such a rejection under either § 101 or § 102 is confusing and therefore bad law. Our research has disclosed only two instances in which rejections for lack of novelty were made by the PTO under § 101, *In re Bergstrom,* 427 F.2d 1394, 57 CCPA 1240, 166 USPQ 256 (1970); *In re Seaborg,* 328 F.2d 996, 51 CCPA 1109, 140 USPQ 662 (1964). In *In re Bergstrom* we in effect treated the rejection as if it had been made under § 102, observing in the process that "The word 'new' in § 101 is defined and is to be construed in accordance with the provisions of § 102." 427 F.2d at 1401, 57 CCPA at 1249, 166 USPQ at 262.

When § 101 was enacted, the accompanying Reviser's Note stated (inserts and emphasis ours):

> The corresponding section of the existing statute [R.S. § 4886] is split into two sections, section 101 relating to the *subject matter* for which patents *may* be obtained ["subject to the conditions and requirements of this title"], and section 102 defining statutory novelty and stating other conditions for patentability.

H.R.Rep. No. 1923, supra at 6, U.S.Code Cong. & Admin.News 1952, p. 2409, another contemporaneous document, states (emphasis ours):

> Part II relates to patentability of inventions and the grant of patents.
>
> Referring first to section 101, this section specifies *the type of material* which can be the subject matter of a patent.

 * * * * * *

Section 101 sets forth the *subject matter* that can be patented "subject to the conditions and requirements of this title." *The conditions* under which a patent may be obtained *follow,* and section 102 covers the conditions relating to novelty.

A person may have "invented" a machine or a manufacture, which may include anything under the sun that is made by man, *but it is not necessarily patentable* under section 101 unless the conditions of the title are fulfilled.

Section 102 in paragraphs (a), (b), and (c) repeats the conditions in the existing law relating to novelty.

The Senate report, No. 1979, makes the identical statement.

The second door then, as we have already seen, is § 102 pursuant to which the inventor's claims are examined for novelty, requiring, for the first time in the examination process, comparison with the prior art which, up to this point, has therefore been irrelevant.

■ Section 102 also contains other conditions under the heading "loss of right" which need not be considered here. An *invention* may be in a statutory category and not patentable for want of *novelty,* or it may be novel and still not be patentable because it must meet yet another condition existing in the law since 1850 when *Hotchkiss v. Greenwood,* 11 How. 248, 13 L.Ed. 683, was decided. This condition developed in the ensuing century into the *"requirement for invention."* See *Graham v. John Deere Co.,* supra.

The third door, under the 1952 Act, is § 103 which was enacted *to take the place of the requirement for "invention."* We need not examine this requirement in detail for it is not involved in the present appeals, and was not involved in *Flook.* It will suffice to quote what the House and Senate reports, cited supra—"signals" from Congress—say about the third requirement, from which it will be seen that, again, the claimed invention for which a patent is sought must be compared with the prior

art. We quote H.R.Rep. No. 1923, supra at 7 U.S.Code Cong. & Admin.News 1952, p. 2399:

> Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the courts. *An invention* which has been made, and which is new in the sense that the *same* thing has not been made [or known] before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. That has been expressed in a large variety of ways in decisions of the courts and in writings. Section 103 states this requirement in the title ["Conditions for patentability; non-obvious subject matter"]. It refers to the difference between the subject matter sought to be patented *and the prior art,* meaning what was known before as described in section 102. If this difference is such that *the subject matter as a whole* would have been obvious at the time [the invention was made] to a person [ordinarily] skilled in the art, then the subject matter cannot be patented. [Insertions and emphasis ours.]

■ If the inventor holds the three different keys to the three doors, his *invention* (here assumed to be "useful" ) qualifies for a patent, otherwise not; but he, as *inventor,* must meet still other statutory requirements in the preparation and prosecution of his patent application. We need not here consider the latter because appellants have not been faulted by the PTO in their paperwork or behavior. The point not to be forgotten is that being an *inventor* and having made an *invention* is not changed by the fact that one or more or all of the conditions for *patentability* cannot be met. Year in and year out this court turns away the majority of the inventors who appeal here because their inventions do not qualify for patents. They remain inventions nevertheless. It is time to settle the point that the terms invent, inventor, inventive, and the like are unrelated to deciding whether the statutory requirements for patentability under the 1952 Act have been met. There is always *an invention* ; the issues is its patentability. Terms like "inventive application" and "inventive concept" no longer have any useful place in deciding questions under the 1952 Act, notwithstanding their universal use in cases from the last century and the first half of this one. As Mr. Justice Holmes said in *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918), "A word * * may vary greatly in color and content according to the circumstances and the time in which it is used." And Mr. Justice Frankfurter said in *Shapiro v. United States,* 335 U.S. 1, 56, 68 S.Ct. 1375, 1403, 92 L.Ed. 1787 (1948), "It is the part of wisdom, particularly for judges, not to be victimized by words."

■ We have observed with regret that the briefs filed by the Solicitor General for Acting Commissioner Parker in *Parker v. Flook,* a case which, as the Court noted, "turns entirely on the proper construction of § 101," badly, and with a seeming sense of purpose, confuse the statutory-categories requirement of § 101 with a requirement for the existence of "invention." This they do by basing argument on the opening words of § 101, "Whoever invents or discovers," thereby importing into the discussion of compliance with § 101 a requirement for "invention" in a patentability sense. But there has not been a requirement for "invention" in the patentability sense in the laws since 1952—the requirement was replaced by the § 103 requirement for nonobviousness. *Graham v. John Deere Co.,* supra. Furthermore, when one has only compliance with § 101 to consider, the sole question, aside from utility, is whether the invention falls into a named category, not whether it is *patentable.* Falling into a category, does not involve considerations of novelty or nonobviousness and *only* those two considerations involve comparison with prior art or inquiry as to whether all or any part of the invention is or is not in, or assumed to be in, the prior art or the public domain. *Prior art is irrelevant to the determination of statutory subject matter un-*

*der § 101.* An invention can be statutory subject matter and be 100% old, devoid of any utility, or entirely obvious. This is our understanding of the statute and the basis on which we proceed to the further consideration of these appeals.

The error of the line of argument pursued in the Solicitor General's briefs in *Flook* is sufficiently illustrated by quoting from the summation of that argument in the opening paragraphs of the Reply Brief for the Petitioner, pages 1 and 2 (footnotes omitted, all emphasis and bracketed material in original):

> 1. Respondent errs in asserting (Br. 7–13) that our argument confuses the standard of nonobviousness prescribed in 35 U.S.C. 103 and the requirement of statutory subject matter under 35 U.S.C. 101. As respondent recognizes, the patent examiner's sole ground for rejection of the claims at issue was that they did not cover statutory subject matter under 35 U.S.C. 101. We do not contend that respondent's particular algorithm for computing updated alarm-limits is not novel or is obvious within the meaning of 35 U.S.C. 102 or 103. We simply contend that the subject matter he seeks to patent is unpatentable under 35 U.S.C. 101, because it is not an "invent[ion] or discover[y]" within the meaning of that Section.
>
> The plain language of Section 101 requires that the application of a mathematical algorithm involve invention or discovery for it to be patentable. It states that patents may issue only to one who *"invents or discovers* any * * * process, machine, manufacture, or composition of matter"* (emphasis supplied). This language dates from the original Patent Act of 1790. In none of the subsequent amendments to the patent statute has Congress altered this basic requirement.

Yet respondent would have the courts ignore this explicit language and adopt a new rule that would allow patents to issue to anyone who "[*applies for a patent on*] any * * * process, machine, manufacture, or composition of matter, * * * subject to the conditions and requirements of this title". Congress could have changed the language of Section 101 to broaden the statutory standards of patentability, but it did not; indeed, respondent agrees (Br. 11) that in the 1952 Patent Act revision, Congress intended to codify the existing judicial precedents regarding the standard of patentability.

■ It is transparently clear that the above argument makes the opening words of § 101, "Whoever invents or discovers," into a requirement for compliance with § 103, the 1952 replacement for the old requirement for "invention"; one must get through the third door in order to get past the first one! That is not the statutory scheme.[5] The statement that respondent Flook was asking for a rule under which "anyone who '[*applies for a patent on*] any * * *'" of the § 101 named categories should have a patent "issue" to him is subversive nonsense. There is no *issuance* without examination for novelty and nonobviousness. The statement that "Congress could have changed the language of section 101 to broaden the statutory standards of patentability, but it did not" is wholly beside the point because § 101 was never intended to be a "standard of patentability"; the standards, or conditions as the statute calls them, are in § 102 and § 103. The naming of the categories of inventions that *may* be patented, in whatever statute appearing, has never supplied a standard. The question here, as it always has been, is:

---

5. In our view, the opening phrase of § 101, "Whoever invents or discovers," merely embodies the constitutional limitation in Article I, section 8, clause 8, that only the *person* who invents or discovers may be the beneficiary of the exercise of Congressional power and thus "obtain a patent * * * subject to the conditions and requirements of this title [Title 35 USC]." The plain meaning of the statute is that certain *persons* may obtain patents for certain enumerated *classes* of subject matter. Provisions are made elsewhere in Title 35 for applications by persons other than the true inventor, *see* §§ 111, 116–18. We find no support in the statute or its legislative history for any other interpretation.

are the inventions claimed of a *kind* contemplated by Congress as possibly patentable *if* they turn out to be new, useful, and unobvious within the meaning of those terms as used in the statute.

For a better understanding of the issues presented by the present appeals, one further matter should be pointed out. An "invention" in the popular sense may have many aspects in the patent law sense and, technically speaking, may really be an aggregation of closely related inventions all pertaining to the same contribution the inventor is making to the technological arts. This will later be seen to be the case with the inventions of Bergy and Chakrabarty. When that is so, the applicant is in a position to define his invention(s) in claims (technical legal definitions of the spheres of *protection* sought, not *descriptions* of the invention) which may fall into different § 101 categories. For example, an inventor may have produced a new product which is made by a new process and put to a new use. The invention is capable, therefore, of being defined or *claimed* as a manufacture or composition of matter, as a process for making the product, and as a process utilizing the product in some way. The PTO has procedures under which it may or may not permit claims of differing types to be prosecuted in the same patent application. In each of the cases here on appeal, the application contains claims of different types—to process and to product. In each application the process claims have been approved—stand "allowed"—only product claims being rejected and on appeal; but in each application all of the claims pertain to the *same invention*, considered broadly and in terms of the contribution of the inventor.

Before explaining the Bergy and Chakrabarty inventions, we shall state our understanding of the views expressed by the Supreme Court in the *Flook* opinion and the

light shed thereby on the problems before us.

### In Light of Parker v. Flook

We are redeciding these appeals, as directed, "in light of *Parker v. Flook*." The parties were given the opportunity in briefs and oral argument to tell us what bearing *Flook* has on these appeals. As might have been foreseen, the results are not helpful.

The PTO says the fact of remand should mandate affirmance and be "taken to buttress the positions taken by the dissenting judges." The only specific thing seized upon, as a launching pad for argument, is a rhetorical passage quoted from *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 512, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), about looking for a signal from Congress before *changing* well-established law, a situation in no way involved here as will be discussed later. As everyone has conceded, we are dealing with appeals raising an issue of first impression in the courts, the effect on compliance with § 101 of the fact of being "alive."

Appellants and amici collectively tell us that *Flook* has no bearing, that it did not deal with the issue here, that we were right the first time, and that the reason for remand is unclear. In short, we can read more for ourselves than we have been told. We have read and analyzed *Flook* diligently.

The only thing we see in common in these appeals and in *Flook* is that they all involve § 101. *Flook* was a review of one of the many appeals we have heard involving the general theme of the patentability of computer programs. The only way to claim a program is as a programmed "machine" or as a "process" or "method." The *Flook* invention was claimed as a "process" under § 101.[6] That was the second case of its

---

**6.** The alternative claiming is as a "machine" under § 101. *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692, 189 USPQ 257 (1976) was such a case but the § 101 issue was not reached by the Court because it affirmed the rejection under § 103, agreeing with the dissenting opinion of Chief Judge Markey. On

the equivalence of process and machine claims in the software field and the application of § 101 *in that field*, see *In re Johnston*, 502 F.2d 765, 772, 183 USPQ 172, 178 (Cust. & Pat.App. 1974) (Rich, J., *dissenting*). For further discussion of the point, of the subject of claiming program inventions generally, and of the line of

kind from this court reviewed by the Supreme Court, the first being *Gottschalk v. Benson*, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), which involved two method claims. Method and process claims are equivalents. *Flook* appears to have been decided on the authority of *Benson*. No method or process claim is here involved. In fact, the PTO has *allowed* (all three doors, §§ 101–2–3, passed) Bergy's method claims 1 through 4 and Chakrabarty's process claims 27 through 29, thereby holding that the process aspects of their inventions are not only *subject matter* within § 101 but also new and unobvious under § 102 and § 103, therefore patentable. *Flook* was concerned only with the question of what is a "process" under § 101, in the context of computer program protection. No such issue is presented in either of these appeals.

There is no better authority on what the Supreme Court has decided in a case than the Court itself and we are fortunate to have its own summary of what it decided in *Flook*. It appears at the end of footnote 18, 437 U.S. at 595, 98 S.Ct. at 2528, as follows:

> Very simply, our holding today is that a claim for an improved method of calculation, even when tied to a specific end use, is unpatentable subject matter under § 101.

We do not venture to elaborate. The appeals here involve no method of calculation, and the *Flook holding* appears to have no bearing.

■ As indicated earlier, we deem it our duty to seek whatever additional light there

may be in the Court's opinion on the meaning of § 101, without restricting ourselves to the holding. It is stated to be well established in patent law that the following are not within the statutory categories of subject matter enumerated in § 101 and its predecessor statutes as interpreted through the years: principles, laws of nature, mental processes, intellectual concepts, ideas, natural phenomena, mathematical formulae, methods of calculation, fundamental truths, original causes, motives, the Pythagorean theorem, and the computer-implementable method claims of Benson and Tabbot. The present appeals do not involve an attempt to patent any of these things and the Court's review of this hornbook law is, therefore, inapplicable to the issue before us, which involves only the construction of the terms "manufacture, or composition of matter."

Another principle stated in *Flook* is that a "mathematical algorithm" or formula is like a law of nature in that it is one of the " 'basic tools of scientific and technological work' " and as such must be *deemed* to be "a familiar part of the prior art," even when it was not familiar, was not prior, was discovered by the applicant for patent, was novel at the time he discovered it, and was useful. This gives to the term "prior art," which is a *very* important term of art in patent law, particularly in the application of § 103,[7] an entirely new dimension with consequences of unforeseeable magnitude.

Insofar as the present appeals are concerned, the foregoing novel principle has no

---

software cases up to January 1974, see J. Landis, *Mechanics of Patent Claim Drafting* 6, § 41 88–102 (2d ed. PLI 1974).

**7.** Section 103 of Title 35 U.S.C. which makes nonobviousness of the invention a prerequisite to patentability requires a determination of "the differences between the subject matter sought to be patented and *the prior art*." (Emphasis ours.) Title 35 nowhere defines the term "prior art." Its exact meaning is a somewhat complex question of law which has been the subject of legal papers and whole chapters of books. See, for example, V. Woodcock, "What is Prior Art?" in *Dynamics of the Patent System* 263–332 (1960), and an enlarged version under the same title in *The Law of*

*Chemical, Metallurgical and Pharmaceutical Patents* 87–215 (H. Forman, Ed., 1967). Basically, the concept of prior art is that which is publicly known, or at least known to someone who has taken steps which do make it known to the public, cf. 35 U.S.C. § 102(e) and the case it codified, *Alexander Milburn Co. v. Davis-Bournonville Co.*, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926), or known to the inventor against whose application it is being applied. See *In re Nomiya*, 509 F.2d 566, 184 USPQ 607 (Cust. & Pat.App.1975); *In re Bass*, 474 F.2d 1276, 59 CCPA 1342, 177 USPQ 178 (1973); *In re Hellsund*, 474 F.2d 1307, 59 CCPA 1382, 177 USPQ 170 (1973).

applicability whatever since, as we have said no formula, algorithm, or law of nature is involved, and there has been no rejection on prior art of any kind in either application. In each, both the examiner and the Board of Appeals expressly stated that no references evidencing prior art have been relied on or applied.

Insofar as the general patent law is concerned, however, the above-stated novel *Flook* doctrine may have an unintended impact in putting an untimely and unjustifiable end to the long-standing proposition of law that patentability may be predicated on discovering the cause of a problem even though, once that *cause* is known, the solution is brought about by obvious means. Such causes may often be classed as laws of nature or their effects. For examples, see *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 67–69, 43 S.Ct. 322, 67 L.Ed. 523 (1922); *In re Roberts*, 470 F.2d 1399, 176 USPQ 313 (Cust. & Pat.App.1973); *In re Conover*, 304 F.2d 680, 49 CCPA 1205, 134 USPQ 238 (1962). The potential for great harm to the incentives of the patent system is apparent.

It is one thing to say that a principle, natural cause, or formula, *per se*, is not within the categories of § 101, but quite another to say it is "prior art" in determining the nonobviousness of an invention predicated on it even though the inventor discovered it.

One final matter with respect to *Flook* remains. In the PTO supplemental brief on remand, the solicitor places great emphasis on part of a passage which *Flook* quoted from the opinion of Mr. Justice White for the majority in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531, 92 S.Ct. 1700, 1708, 32 L.Ed.2d 273 (1972):

> We would require a clear and certain signal from Congress before approving the position of a litigant who, as respondent here, argues that the beachhead of privilege is wider, and the area of public use narrower, than the courts had previously thought. No such signal legitimizes respondent's position in this litigation.

While the solicitor believes that the entire opinion in *Flook* is relevant to the issue here, he says "the above quotation from *Deepsouth* reaches the heart of the matter."

We disagree. We cannot find in this passage any clear direction signal unless we wrench it out of the context in which it belongs and use it in a manner unwarranted by the situation which spawned it.

When we examine the portion of the paragraph in *Deepsouth* (also quoted in *Flook*) just preceding the solicitor-quoted passage, its meaning becomes clear. The Court stated: "It follows that we should not expand patent rights *by overruling or modifying our prior cases* construing the patent statutes, unless the argument for expansion of privilege is based on more than mere inference from ambiguous statutory language." (Emphasis ours.) The issue in *Deepsouth* was whether petitioner infringed by selling the unassembled parts of machines embodying patented combinations to foreign buyers who assembled and used them abroad. The relevant statutory provision, 35 U.S.C. § 271, defines infringement by defining the infringer as anyone who "without authority *makes*, uses or sells any patented invention, *within the United States* during the term of the patent therefor * * *." (Emphasis ours.) In deciding the case, the Court pointed out that a long line of judicial authority had established the meaning of the term "makes" contrary to the meaning urged by the respondent, with the result that the petitioner's sales of the parts to foreign buyers were not sales of "any patented invention" which was "made" in the United States, and, thus, were not acts of infringement. It is in this context that the Court made the quoted statement. The respondent in *Deepsouth* was asking the Court to expand established patent rights territorially, or to treat making parts of a machine as making the machine, by modifying prior cases construing the patent statutes. The Court refused, producing the quoted passage in the process.

■ We do not find the quoted passage to have any bearing on our problem. We

are not faced with a litigant urging upon us a construction of § 101 which is at odds with established precedent. Rather, we deal with a case of first impression. Not having been asked to make a change in existing law or to overrule or modify any case or to expand any right given by Congress, we need in this case no signal from that body.

To conclude on the light *Flook* sheds on these cases, very simply, for the reasons we have stated, we find none.

### The Inventions of Bergy and Chakrabarty

#### 1. Bergy, Coats, and Malik

These inventors, whom we collectively call "Bergy," provided the usual abstract in their patent application, which is a succinct statement of what they invented. It reads:

> Microbiological process for preparing the antibiotic lincomycin at temperatures ranging from 18°C. to 45°C. using the newly discovered microorganism *Streptomyces vellosus*. The subject process advantageously results in the preparation of lincomycin without the concomitant production of lincomycin B (4'-depropyl-4'-ethyllincomycin). The absence of lincomycin B production results in increased lincomycin recovery efficiency.

It is noted from this statement that Bergy invented a process for producing an old antibiotic and in the course of doing so discovered a previously unknown microorganism. The close relationship of the two inventions is apparent from the fact that it is this microorganism which, under the proper fermentation conditions, produces the antibiotic lincomycin, which had previously been produced from a different microorganism called *S. lincolnensis* and identified by the deposit number NRRL 2936. This former process was the subject of U.S. patent No. 3,086,912. The microorganism which Bergy discovered has the identifying number NRRL 8037. The application was filed with four claims to Bergy's process, all of which the examiner allowed. Claim 1, the only independent process claim, reads:

> A novel process for preparing the antibiotic lincomycin which comprises culti-vating *Streptomyces vellosus*, having the identifying characteristics of NRRL 8037, and lincomycin-producing mutants thereof, in an aqueous nutrient medium under aerobic conditions until substantial antibiotic activity is imparted to said medium by the production of lincomycin.

As is obvious, that process is an industrial process in the pharmaceutical branch of the chemical industry and is performed by cultivating a living organism which produces the desired antibiotic. Were it not for the life process, nothing would happen. Since the process has been held to be patentable by the PTO, that claim and allowed claims 2, 3, and 4 dependent from it are not before us.

By a preliminary amendment, filed before the examiner acted on the application, appealed claim 5 was added together with the attorney's statement that "Basis for claim 5 can be found throughout the disclosure." Claim 5 reads:

> A biologically pure culture of the microorganism *Streptomyces vellosus*, having the identifying characteristics of NRRL 8037, said culture being capable of producing the antibiotic lincomycin in a recoverable quantity upon fermentation in an aqueous nutrient medium containing assimilable sources of carbon, nitrogen and inorganic substances.

The designation "NRRL 8037" in the claims is elucidated by the following statement in the specification.

#### The Microorganism

> The novel actinomycete used according to this invention for the production of lincomycin is *Streptomyces vellosus*. One of its strain characteristics is the production of lincomycin without the concomitant production of lincomycin B. Another of its strain characteristics is the production of comparable titers of lincomycin at a temperature of 28°C. and 45°C. A subculture of this living organism can be obtained upon request from the permanent collection of the Northern Regional Research Laboratories, Agricultural Research Services, U.S. Department of Agriculture, Peoria, Illinois, U.S.A. Its

accession number in this repository is NRRL 8037.

The specification continues:

> The microorganism of this invention was studied and characterized by Alma Dietz of the Upjohn Research Laboratory.

What follows that statement is an elaborate, highly technical, detailed description of the microorganism, including its type designation as "*Streptomyces vellosus* Dietz, sp.n.," occupying over ten pages of the printed specification, followed by exemplary descriptions of the production of lin-.comycin therefrom by fermentation processes and the recovery of the lincomycin produced by the fermentation.

A patent draftsman faced with the problem of obtaining protection for Bergy's invention necessarily had to begin with a determination of what Bergy had produced that is useful, new, and unobvious and what statutory category or categories it fits into. The problem was how to claim the invention. There were the usual options. Bergy's claim draftsman appears to have first determined that Bergy had invented a new and improved *process of making lincomycin* which could be conducted with advantage at higher temperatures so that less cooling was required and with the further advantage of less production of unwanted lincomycin B. The invention was, therefore, claimed as a process, as set forth in allowed claim 1, supra. It appears that further analysis by the claim draftsman of *what* was new and nonobvious about the process developed the insight that it was Bergy's development of the biologically pure culture of *Streptomyces vellosus*, the microorganism which he discovered, the pure culture of which was the one thing which made the process possible. The process is the use of the culture; it is the microorganism culture which makes the lincomycin. Without the culture, the process does not exist. Bergy's invention might be said to "reside in" the culture which he made of the microorganism he discovered. Another way of defining his invention in a claim, therefore, was to define the culture, as claim 5 does. Bergy says the culture of claim 5 falls into either the "manufacture" or the "composition of matter" category of § 101. It does not matter to our decision which it is as the PTO makes no differentiation. The PTO simply says it can be neither.

If, as the allowance of claim 1 indicates, Bergy's invention, when defined as a process, is patentable because it meets all of the requirements and conditions of the patent statutes, why is it not patentable when defined as in claim 5? That is the sole problem posed by Bergy's appeal. We shall return to it after we have explained the rejection.

### 2. Chakrabarty [8]

Chakrabarty's invention is in the relatively new and highly complex field of cellular or genetic engineering or microbial genetics. His specification is in such technical terms that it commences with the definition of some 17 terms. We shall refer only to 3 which seem necessary to give meaning to the claims we shall mention. Like Bergy's invention, Chakrabarty's is concerned with microorganisms. Unlike Bergy's which manufactured antibiotics, Chakrabarty's were engineered to solve another one of man's practical needs, getting rid of oil spills. This they do by breaking down or "degrading" the components of the oil into simpler substances which serve as food for aquatic life whereby the oil, assumed to be floating on the sea, is absorbed into it.

---

8. Ananda M. Chakrabarty, according to his declaration in the record, received a Ph.D. in biochemistry from Calcutta University in 1965, was a Post Doctoral Research Associate at the University of Illinois (Urbana) until 1971, and since then has been a Staff Microbiologist in the Research and Development Center of General Electric Company. At the time of the declaration, 1974, he had authored or co-authored some 25 technical papers in his field.

According to the amicus brief of The Regents of the University of California (n. 11):

> The pioneering character of the *Chakrabarty* invention in issue was specifically recognized in an article appearing in National Geographic vol. 150, pp. 355–395, at 374–5 and 383–4 (September 1976).

Further recognition of the significance of his invention appears in R. Cooke, *Improving on Nature*, at 152–63 (1977).

Chakrabarty's invention is illustrated, with respect to its use, in connection with the degradation of crude oil and "Bunker C" oil, which are described as follow:

Crude oils, of course, vary greatly (depending upon source, period of activity of the well, etc.) in the relative amount of linear aliphatic, cyclic aliphatic, aromatic and polynuclear hydrocarbons present, although some of each of these classes of hydrocarbons is typically present in some amount in the chemical make up of all crude oils from producing wells.

\* \* \* \* \* \*

Bunker C is (or is prepared from) the residuum remaining after the more commercially useful components have been removed from crude oil. This residuum is very thick and sticky and without significant use, per se.

Thus, "oil" is a mixture of several component hydrocarbon compounds and the ability to break down one component is not the ability to break down oil. Chakrabarty's specification gives the following explanation:

Microbial strains are known that can decompose individual components of crude oil (thus, various yeasts can degrade aliphatic straight-chain hydrocarbons, but not most of the aromatic and polynuclear hydrocarbons). *Pseudomonas* and other bacteria species are known to degrade the aliphatic, aromatic and polynuclear aromatic hydrocarbon compounds, but, unfortunately any given strain can degrade only a particular component. For this reason, prior to the instant invention, biological control of oil spills had involved the use of a mixture of bacterial strains, each capable of degrading a single component of the oil complex[,] on the theory that the cumulative degradative actions would consume the oil and convert it to cell mass. This cell mass in turn serves as food for aquatic life. However, since bacterial strains differ from one another in a) their rates of growth on the various hydrocarbon components, b) nutritional requirements, production of antibiotics or other toxic material, and c) requisite pH,

temperature and mineral salts, the use of a mixed culture leads to the ultimate survival of but a portion of the initial collection of bacterial strains. As a result, when a mixed culture of hydrocarbon-degrading bacteria are deposited on a oil spill the bulk of the oil often remains unattacked for a long period of time (weeks) and is free to spread or sink.

In essence what Chakrabarty invented was new strains of *Pseudomonas* having the new capability within themselves of degrading several different components of oil with the result that degradation occurs more rapidly. This he did by transmission into a single bacterial cell of a plurality of compatible "plasmids," thereby creating the new strains. The specification discloses two such new strains on deposit with the Department of Agriculture's Northern Regional Research Laboratories, NRRL B–5472 and NRRL B–5473. Before proceeding further, we quote some of the definitions from the specification:

*Extrachromosomal element* . . . a hereditary unit that is physically separate from the chromosome of the cell; the terms "extrachromosomal element" and *"plasmid"* are synonymous; when physically separated from the chromosome, some plasmids can be transmitted at high frequency to other cells, the transfer being without associated chromosomal transfer. [Second emphasis added.]

\* \* \* \* \* \*

Plasmids are believed to consist of double-stranded DNA [deoxyribonucleic acid] molecules. The genetic organization of a plasmid is believed to include at least one replication site and a maintenance site for attachment thereof to a structural component of the host cell.

\* \* \* \* \* \*

*Degradative pathway* . . . a sequence of enzymatic reactions (e. g. 5 to 10 enzymes are produced by the microbe) converting the primary substrate [i. e., oil] to some simple common metabolite, a normal food substance for microorganisms.

To create his new strains of microorganisms, Chakrabarty started with a strain of *Pseudomonas aeruginosa*, which itself exhibited no capacity for degrading any component of oil. By a unique process, the details of which we need not consider, he transferred four plasmids, having the individual capabilities for degrading n-octane (a linear aliphatic hydrocarbon), camphor (a cyclic aliphatic hydrocarbon), salicylate (an aromatic hydrocarbon), and naphthalene (a polynuclear hydrocarbon), into the *Pseudomonas aeruginosa* bacterium that previously had none of the plasmids in question. This resulted in a new strain having new capacities to produce numerous enzymes to degrade four main components of oil.

Chakrabarty thus describes how to use his new bacterium:

> In practice an *inoculum* of dry (or lyophilized [freeze-dried]) powders of these genetically engineered microbes will be dispersed over (e. g. from overhead) an oil spill as soon as possible to control spreading of the oil * * * . A particularly beneficial manner of depositing the inoculum on the oil spill is to *impregnate straw with the inoculum* and drop the inoculated straw on the oil spill where both components will be put to use—the *inoculum (mass of microbes)* to degrade the oil and the *straw to act as a carrier* for the microbes and also to function as an oil absorbent. Other absorbent materials may be used, if desired, but straw is the most practical. [Emphasis ours.]

We turn now to the claiming of Chakrabarty's invention, hoping that the foregoing explanation of what he invented, though undoubtedly technically inadequate, is not too inaccurate and is sufficient to present clearly the legal issue. It is clear enough that the central core of the invention is a new strain or strains of bacteria, and that part of the invention is a process of combating oil spills. The patent draftsman presented four groups of claims; two groups have been rejected and two allowed, the former group being the claims on appeal. Claims of the first group, 7–9, 13, 15, 17, and 21, are directed to a bacterium. Claim 7 is the only independent claim and the others are dependent from it. Claim 7 reads:

> 7. A bacterium from the genus *Pseudomonas* containing therein at least two stable energy-generating plasmids, each of said plasmids providing a separate hydrocarbon degradative pathway.[9]

The second group, 21 and 24–26, are directed to an inoculum, the only independent claim being 21 which reads:

> 21. An inoculum for the degradation of a pre-selected substrate comprising a complex or mixture of hydrocarbons, said inoculum consisting essentially of bacteria of the genus *Pseudomonas* at least some of which contain at least two stable energy-generating plasmids, each of said plasmids providing a separate hydrocarbon degradative pathway.

It will be noted that claims 7 and 21 are but alternative ways of claiming substantially the same thing since the inoculum consists essentially of the bacterium. As we saw earlier, the inoculum may be a dried preparation of the new bacteria in the form of a powder. These two groups of claims are under rejection as not being "manufactures" or "compositions of matter" within § 101.

The third group consists of claims 27–29 directed to a process or improvement in a process of transferring plasmids from a donor to a recipient bacterium. The fourth group consists of claims 30–32, 35, and 36 directed to an inoculated medium, the only independent claim being claim 30 which reads:

> 30. An inoculated medium for the degradation of liquid hydrocarbon substrate material floating on water, said inoculated medium comprising a carrier material able to float on water and bacteria from the genus *Pseudomonas* carried thereby, at least some of said bacteria each containing at least two stable energy-generating plasmids, each of said plas-

---

**9.** As a matter of general interest, the assignee of appellant's invention has been granted British patent 1,436,573 containing this and other claims to the bacterium.

mids providing a separate hydrocarbon degradative pathway and said carrier material being able to absorb said hydrocarbon material.

These claims of the last two groups of claims have been held to be patentable by the PTO and have been allowed. Therefore, Chakrabarty will be able to have a patent on his invention as defined therein.

Comparison of claim 30 with rejected claims 7 and 21, supra, shows that it differs from them in substance only in adding to the bacterium of claim 7 or the inoculum of claim 21 a "carrier" which will float on water and absorb oil. As shown above, the preferred carrier is straw. The significance of this is that the PTO obviously has no hesitation in issuing a patent on the living bacterium or inoculum when applied to or mixed with straw, which combination it must consider to be a manufacture or a composition of matter under § 101, but refuses to issue a patent on the new bacterium or inoculum itself which is Chakrabarty's real contribution to the technological arts.

*The Rejections*

1. Chakrabarty

We take up Chakrabarty's application first because it was the first to be filed and the first to be decided by the PTO board, as we stated at the beginning of this opinion.

The PTO Board of Appeals *said* the examiner rejected the appealed claims as not within § 101 for two reasons: (1) the claimed microorganisms are "products of nature" and (2) the claims "are drawn to live organisms." However, we do not find in the examiner's final rejection or Answer on the appeal any rejection other than (1). Rejection (2) appears to have been created in the board by misreading the Answer. In expressly reversing ground (1), the board said:

> We agree with appellant that the claimed bacteria may not be considered as being "products of nature" simply because from the record we must conclude that *Pseudomonas* bacteria containing two or more different energy generating plasmids are not naturally occurring.

This left only ground (2), which the board sustained. In its opinion it said it had examined the cases cited by the examiner and appellant and others as well and had found "no case dealing directly with the point here in issue * * *." It viewed the question before it as "whether living organisms (appellant's modified bacterium) are patentable subject matter under 35 U.S.C. 101." It next said, "We realize that 35 U.S.C. 101 does not expressly exclude patents on living organisms * * *." It then propounded the theory the PTO has pursued ever since to the effect that Congress could not have intended § 101 to include *any* living thing because, if it had, Congress would not have found it necessary to pass the Plant Patent Act of 1930 (Pub.L. No. 245, 46 Stat. 376) which amended R.S. § 4886, in order to provide protection for plants. The board reasoned that if plants, which are alive, were not thought by Congress to be within § 101, then *nothing* alive is within it. Conversely, the board felt that if new species of bacteria were held to be within § 101, then logically it would have to follow that *all* life forms would be, including the human species. It therefore sustained the rejection of the appealed claims on the sole ground that the bacteria covered thereby are "alive," basing its holding on its view of what Congress must have intended.

2. Bergy

When we first considered the *Bergy* board opinion we were not aware of the *Chakrabarty* board decision, which only came to our attention several months later. We now understand *why* the board opinion, which we formerly characterized as "quite out of the ordinary" because it disregarded the examiner's ground of rejection to the point of refusing to consider it, substituted for the examiner's ground its own view that appealed claim 5 was properly rejected because it covered a living organism. The *Bergy* board was adopting the *Chakrabarty* board's reasoning to the point of copying a large portion of it verbatim. It is therefore, in substance, the same decision.

The examiner's sole ground of rejection of Bergy's claim 5, as stated in his final rejection, was:

Claim 5 is rejected under 35 U.S.C. 101 as non-statutory subject matter. Claim 5 claims a *product of nature* (Streptomyces vellosus NRRL 8037). See *In re Mancy et al.* 192 USPQ 303 at page 306, second sentence before [4]. [Emphasis ours.]

Bergy responded with a request to reconsider this rejection, supported by affidavits of three Upjohn microbiologists, Dr. Joseph E. Grady, Dr. Thomas L. Miller, and "the well-known microbial taxonomist Alma Dietz," pointing out that the microorganism did not exist as a biologically pure culture in nature and asserting that such a culture is a "manufacture" under § 101, supra. In so arguing, Bergy made the point that the pure culture is "a product of a microbiologist." As bearing on the nature of Bergy's invention, we note what the affiants' main points were. Dr. Grady said:

The "biologically pure culture" of claim 5 is a well-defined product of the microbiologist which is capable of producing the desired antibiotic lincomycin under controlled fermentation conditions. In contrast, the soil source in which the microorganism was discovered is a complex microbial environment which, as such, could not be used to produce a desired product under any known fermentation conditions.

\* \* \* \* \* \*

In summary, soil contains a complex jungle of microorganisms. It is only by the discovery and skills of the microbiologist that biologically pure cultures of microorganisms come into existence.

Alma Dietz said:

Microorganisms found in the soil are complex in kind and can not be taxonomically characterized without first producing a biologically pure culture. This clearly establishes that the "biologically pure culture" of Claim 5 is *not* found in nature; it is the product of a microbiologist.

Dr. Miller said:

The fermentation disclosed in application Serial No. 477,766 is conducted with a biologically pure culture of *S. vellosus.* A biologically *impure* culture of *S. vellosus* would *not* give the desired fermentation product under the conditions disclosed in application Serial No. 477,766, or possibly under *any* fermentation conditions.

\* \* \* \* \* \*

It is clear to me that the "biologically pure culture" of Claim 5 is a product of a microbiologist and *not* a product of nature.

After considering these affidavits, the examiner adhered to his view, which he summarized in his Answer on the appeal to the board as follows:

Claim 5 is rejected under 35 USC 101 as drawn to nonstatutory subject matter. Claim 5 defines a microorganism, which is a product of nature \* \* \*.

He thus ignored the opening words of claim 5, "A biologically pure culture of," which constitute a material claim limitation.

The board majority, in turn, ignored the examiner's ground of rejection. It did not even mention it until the end of its opinion where it said it did "not reach and [did not] need to decide" whether being a product of nature would preclude patenting, and said of the affidavits that they were "not germane to the issue which we consider is presented to us by the facts of this case." That issue, to which it devoted its opinion, it stated to be "whether or not a microorganism, being a living thing, is or is not within the realm of statutory patentable subject matter \* \* \*." Like the *Chakrabarty board,* it said it had "not found any case directly in point." It then copied the Chakrabarty board's reasoning and came to the same conclusion.

 This raises a technical procedural question which we dispose of at this point. Since *In re Wagenhorst,* 64 F.2d 780, 20 CCPA 991, 17 USPQ 330 (1933), it has been the rule that when the board affirms an examiner's rejection generally without reversing a ground the examiner relied on, that ground is assumed to be affirmed. *See*

37 CFR 1.196(a). We have an anomalous situation here in that the board affirmed on a *new* ground without so stating, not reaching the *sole* ground relied on by the examiner. Therefore, in case there is doubt as to whether the examiner's product-of-nature rejection is still an issue in this case, in the interest of judicial economy we rule on it now. It involves only a question of law and there is sufficient evidence in the record. *See Silvestri v. Grant,* 496 F.2d 593, 181 USPQ 706 (Cust. & Pat.App.1974) (question of law of suppression under § 102(g) need not be remanded for board's views); *In re Fielder,* 471 F.2d 640, 176 USPQ 300 (Cust. & Pat.App.1973) (justice not served by remand in light of investment of time and effort made by parties). *See also In re Honeywell,* 497 F.2d 1344, 1350, 181 USPQ 821, 826 (Cust. & Pat.App.1974) (Rich, J., *concurring*) (remand not necessary where issue involves question of law which has been briefed). We hold that Bergy's claim 5 clearly does not define a product of nature.

There was a lengthy dissenting opinion by one member of the board, Acting Examiner-in-Chief Murray Katz, in which, after examination of numerous cases cited and others, he stated these conclusions:

 * * * I do not believe that the fact that plants and bacteria have some properties in common is sufficient basis for holding that bacteria are to be excluded from patent coverage. * * *
 * * * I do not find it improper to claim living organisms * * *.

In view of the discussed cases, and since 35 U.S.C. 101 does not expressly exclude patents to living organisms, it is my opinion that living organisms, as claimed, may be patented if such claims also fulfill the other requirements of the statute.

### Decision on the Merits

 We adhere to our former decisions that Bergy's and Chakrabarty's appealed claims define subject matter that falls within the categories named in § 101 and are thus "statutory subject matter."

 This court *unanimously* believes it is not necessary that Congress shall have *foreseen* a new field of technology or useful art to bring it within § 101. As the Supreme Court said in *Barr v. United States,* 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945),

 * * * if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators. *Puerto Rico v. Shell Co.,* 302 U.S. 253, 257 [58 S.Ct. 167, 82 L.Ed. 235;] *Browder v. United States,* 312 U.S. 335, 339 [61 S.Ct. 599, 85 L.Ed. 862,] and cases cited.

Clearly, the language Congress chose to use in § 101 fairly brings the appealed claims within the statute. To insist on specific Congressional foresight in construing § 101 would be the very antithesis of the Constitutional and Congressional purpose of stimulating the creation of new technologies—by their nature unforeseeable—and their progressive development. This has been clear since *Kendall v. Winsor,* 21 How. 322, 62 U.S. 322, 328, 16 L.Ed. 165 (1859), wherein the Supreme Court said:

The true policy and ends of the patent laws enacted under this Government are disclosed in that article of the Constitution, the source of all these laws, viz: "to promote the progress of science and the useful arts," *contemplating and necessarily implying their extension, and increasing adaptation* to the uses of society. [Emphasis ours.]

The present recital of categories in § 101, "*any* new and useful process, machine, manufacture, or composition of matter, or *any* new and useful improvement thereof" (our emphasis), has been the same ever since the Patent Act of 1793, except for substituting "process" for "art" and defining it (§ 100(b)) to include art. For the nearly 200 years since, those words have been liberally construed to include the most diverse range imaginable of unforeseen develop-

ments in technology.[10] The list is endless and beyond recitation. We merely suggest that the Founding Fathers and the Congresses of the past century could not have foreseen the technologies that have allowed man to walk on the moon, switch travel from the railroads to heavier-than-air craft, fill our houses with color TV, cure normally fatal diseases with antibiotics produced by cultures of molds (microorganisms), and give to schoolchildren at small cost pocket calculators with which they can produce square roots in microseconds through complex electronic circuity on an "IC" (integrated circuit) so small the circuits are not visible to the naked eye.

American industry is on the threshold of a new advance in microorganisms technology in which man is exploring more intensely and learning to better convert to his use the micro-world of living cells, the field of molecular biology, a new branch of a useful art which has existed for many years. According to the amicus brief filed on behalf of Genentech, Inc., its research has resulted in the creation, for the first time, of a new bacterial organism capable of producing a human hormone. An article in *Business Week,* Dec. 12, 1977, page 128, entitled "A commercial debut for DNA technology," states that Genentech is a "tiny San Francisco company, just two years old," and that the hormone is "somatostatin [which] has potential both as a research tool and as a medicine, and variations on its structure

might well open the way for a whole new family of drugs capable of treating diseases that today defy medicine's best efforts." The amicus brief states that, more recently, "Genentech and its City of Hope [Medical Center] collaborators applied the technology to create other microorganisms, and used them to produce no less than human insulin itself." This same work is referred to in the *Harvard Magazine* for September-October 1978, page 27, under the heading "Findings," where it is stated that Professor Gilbert and colleagues at Harvard "used gene-transplant techniques to get the common bacteria *Escherichia coli* to produce rat insulin." The statement adds, "The University has filed a patent application for parts of the successful procedure." The article refers to these procedures, using man-made microorganisms, as "bacterifacture (the production of needed substances by bacteria)."

We believe § 101 and its predecessor statutes were broadly drawn in general terms to broadly encompass unforeseeable future developments, as broadly, we suggest, as section 2 of the Sherman Act, 15 U.S.C. § 2. We have been shown no justification for the *Bergy* board's view that § 101 "must be strictly construed." [11]

 What we deal with here in each appeal is an industrial product used in an industrial process in a useful or technological art. *See In re Waldbaum,* supra. The nature and commercial uses of biologically

---

**10.** *See* Wegner, *The Patentability of "New Manufactures"—The Living Invention,* " 'New Manufactures'—Encouragement of Pioneer Research," 1978 Patent Law Conference Coursebook (BNA) 253–62. (Mr. Wegner has extensively researched the question while a fellow at the Max Planck Institute for Foreign and International Patent, Copyright, and Competition Law, Munich, Germany. *See* Wegner, *Patent Protection for Novel Microorganisms Useful for the Preparation of Known Products,* 5 Int'l Rev. Indus.Prop. & Copyright L. 285 (1974); Wegner, *Patenting Nature's Secrets—Microorganisms,* 7 Int'l Rev.Indus.Prop. & Copyright L. 235 (1976).

**11.** P. J. Federico (a principal draftsman of the Patent Act of 1952 and author of "Commentary on the New Patent Act," 35 U.S.C.A. p. 1) has explained the broad language of § 101 as delineating a "general industrial boundary," in "Sec-

tion 101: Subject Matter for Patents," *The Law of Chemical, Metallurgical, and Pharmaceutical Patents* 53, 58 (H. Forman, Ed.1967):

As stated by Glascock and Stringham [*Patent Law* 22 (1943)]:

"In the statute there is no basis for assuming that these [four terms—machine, manufacture, composition of matter, and process or art] represent four separate compartments of invention. Rather does *the use of the four terms represent an effort to indicate the general industrial boundary of the single field of patentable invention.*" [Emphasis ours.]

The first three terms, machines, manufactures and compositions of matter, refer to physical *things,* while the fourth, process, refers to *acts.* Hence the general field may be considered as consisting of new things and new acts * * *.

pure cultures of microorganisms like the one defined in Bergy's claim 5 and the modified microorganisms claimed by Chakrabarty are analogous in practical use to inanimate chemical compositions such as reactants, reagents, and catalysts used in chemical industry. According to an article cited but not relied on by the solicitor entitled "Microbiological Applications and Patents" by Harvey W. Edelblute in *The Encyclopedia of Patent Practice and Invention Management* at 567, edited by R. Calvert (1964), microbiological processes have long been used "to make beer, wine, cheese, bread, pickles and sauerkraut, rett flax, age tobacco, bate leather, produce silage and digest sewage." But more to the point here, in recent years, according to Edelblute, they have come to be used to "produce a vast variety of chemicals and drugs such as alcohols, ketones, fatty acids, amino acids, vitamins, antibiotics, steroids, and enzymes." Edelblute provides a "far from complete list" of chemical reactions carried out by microorganisms, which he names, which include oxidation, reduction, condensation, esterification, amination, deamination, phosphorylation, hydrolysis, decarboxylation, methylation, dismutation, acrylation, and dehydration.[12] In short, microorganisms have long been important tools in the chemical industry, especially its pharmaceutical branch, and when such a useful, industrial tool is invented which is new and unobvious, so that it complies with those conditions for patentability, we see no reason to deprive it or its creator or owner of the protection and advantages of the patent system by arbitrarily excluding it at the outset from the § 101 categories of patentable invention on the sole ground that it is alive. It is because it is alive that it is useful. The law has long and unhesitatingly granted patent protection to new, useful, and unobvious chemical compounds and compositions, in which category are to be found such important *products* of microbio-

logical process as vitamin B–12 and adrenalin[13] and countless other pharmaceuticals. We see no sound reason to refuse patent protection to the microorganisms themselves, or to pure microorganism cultures,— the tools used by chemical manufacturers in the same way as they use chemical elements, compounds, and compositions—when they are new and unobvious. In fact, we see no *legally* significant difference between active chemicals which are classified as "dead" and organisms used for their *chemical* reactions which take place because they are "alive." Life is largely chemistry. We think the purposes underlying the patent system require us to include microorganisms and cultures within the terms "manufacture" and "composition of matter" in § 101. Whether they *otherwise* qualify for patents under § 102 and § 103 is a question not before us. In short, we think the fact that microorganisms are alive is a distinction without legal significance and that they should be treated under § 101 no differently from chemical compounds.

There are two cases which have been persistently relied on by the examiners, the *Bergy* board, and the solicitor which we thought we had disposed of in our earlier opinions, but they turned up again in the *Bergy* petition for certiorari (p. 6), which is the only reason we consider it worthwhile to discuss them. The petition cited them only for what is admittedly "dicta" which is said to "suggest" that "living things" are not patentable. The cases are *Guaranty Trust Co. of New York v. Union Solvents Corp.*, 54 F.2d 400, 12 USPQ 47 (D.Del. 1931), aff'd, 61 F.2d 1041, 15 USPQ 237 (CA 3 1932); and *In re Mancy*, 499 F.2d 1289, 182 USPQ 303 (Cust. & Pat.App.1974). Before discussing them, we point out that the *Bergy* petition misstated the issue. It is not whether *living things* are patentable. The "Question Presented" in the petition was stated to be "Whether a living organ-

---

12. "Bacteria are universal biochemists * *." A. Bryan, C. A. Bryan, & C. G. Bryan, *Bacteriology* v (6th ed. 1962).

13. *Merck & Co. v. Chase Chemical Co.*, 273 F.Supp. 68, 155 USPQ 139 (D.N.J.1967); *Merck & Co. v. Olin Mathieson Chemical Corp.*, 253 F.2d 156, 116 USPQ 484 (CA 4 1958); *Parke Davis & Co. v. H. K. Mulford Co.*, 189 F. 95 (S.D.N.Y.1911), aff'd, 196 F. 496 (CA 2 1912).

ism is patentable subject matter under 35 U.S.C. 101." That statement—typical of the PTO position from the outset—is overly broad, which is calculated to magnify its importance. We are not dealing with all living things, including man, fruits, vegetables, and flowers—all "organisms." A correct statement of the *Bergy* issue would be: Is a man-made, biologically-pure culture of a microorganism, for industrial use in manufacturing an antibiotic, whose properties were discovered by the applicant for patent, excluded from the terms "manufacture" and "composition of matter" in 35 U.S.C. § 101 because the microorganism is alive? To give a homely simple analogy, it is like asking whether a yeastcake or dried yeast powder is a "manufacture" or "composition of matter." Yeast is alive.

All that this court's *Mancy* case has been cited for is a bit of dictum bearing on a hypothetical situation which was not before us. The case involved claims to a *process* of producing a particular known antibiotic by aerobically cultivating a particular strain of *Streptomyces bifurcus.* The claims were rejected for obviousness under 35 U.S.C. § 103 on references showing various strains of other *Streptomyces* species used for the same purpose. We reversed, holding that *In re Kuehl,* 475 F.2d 658, 177 USPQ 250 (Cust. & Pat.App.1973), was controlling and that the new *Streptomyces bifurcus* strain *discovered by Mancy* himself as part of the invention being claimed could not be used as prior art in determining the obviousness under § 103 of his claims to a process of using it to produce the old antibiotic. In comparing the facts of the case before us in *Mancy* with the facts of *Kuehl,* we said (499 F.2d at 1294, 182 USPQ at 306):

> We recognize the differences between this case and the situation in *Kuehl,* where the novel zeolite used as a catalyst in the claimed hydrocarbon cracking processes was itself the subject of allowed claims in the application. Here appellants not only have no allowed claim to the novel strain of *Streptomyces* used in their process but would, we presume (without deciding), be unable to obtain such a claim because the strain, while

new in the sense that it is not shown by any art of record, is, as we understand it, a "product of nature." However, it is not required for unobviousness of the method-of-use claims that the new starting material be patentable * * *.

If it is not clear from the context that we were not discussing what is or is not statutory subject matter within § 101 but only a difference between two cases which we found not to be a reason for distinguishing them, and that we were not expressing any view, even by way of dictum, on the patentability of living organisms as such, we now make it explicit that the thought underlying our presumption that Mancy could not have obtained a claim to the strain of microorganism he had described was simply that it *lacked novelty.* We were thinking of something preexisting and merely plucked from the earth and claimed as such, a far cry from a biologically pure culture produced by great labor in a laboratory and so claimed. The dissenting board member was entirely correct in so interpreting our *Mancy* dictum. The examiner relied on it only to support his product-of-nature reasoning, and the board majority did not mention it, having abandoned that reasoning. Furthermore, it now appears to us, in light of what we have learned in this case about the separation and identification of new strains of *Streptomyces,* that our dictum was ill-considered. Had we known what we now know, we would likely have abjured the stated presumption.

*Guaranty Trust Co. v. Union Solvents Corp.,* supra, was cited by the examiner as "especially pertinent" and again by the solicitor as a "judicial precedent" solely for the following passage appearing at the very end of the long trial court opinion (54 F.2d at 410, 12 USPQ at 57, emphasis ours):

> Lastly, the defendant contends that the invention of the Weizmann patent is unpatentable since it is for the *life process* of a living organism. *Were the patent for bacteria per se, a different situation would be presented.* As before stated, the patent is *not* for bacteria *per se.* It is for a fermentation *process* employing

bacteria discovered by Weizmann under conditions set forth in the specification and claims. *Undoubtedly there is patentable subject-matter in the invention. Cochrane v. Deener,* 94 U.S. 780, 24 L.Ed. 139; *Risdon Iron & Locomotive Works v. Medart,* 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899; *Cameron Septic Tank Co. v. Village of Saratoga Springs,* 159 F. 453 (C.C.A. 2); *Dick v. Lederle Antitoxin Laboratories* (D.C.) 43 F.2d 628. [6 USPQ 40 (S.D.N.Y.1930)].

The statement the examiner relied on, "Were the patent for bacteria *per se,* a different situation would be presented," is a trite observation of minimal magnitude as precedent dealing with a non-issue on which no opinion was expressed. What we find of interest and, indeed, "pertinent" is the fact that the defendant urged the unpatentability of claims because they involved a *life* process of a *living* organism and *the court rejected the argument.* At the outset, the opinion states that one of the defenses was "non-patentable subject matter." The real plaintiff in the case was Commercial Solvents Corporation, exclusive licensee under the Weizmann patent in suit, which corporation was making butyl alcohol and acetone by the Weizmann bacteriological fermentation process, and, with its predecessors, had been doing so since 1918. In 1929 the production was 107,500,000 pounds. The trial court noted that "The record shows that an important and extensive new industry has now been developed and established upon the Weizmann process." It was very clear to the court that it was dealing with a life process for, in describing the invention, it said, " 'Fermentation' is the chemical change, or the decomposition into new chemical compounds, of a substratum, by living organisms, such, for example, as yeast or bacteria." On the issue whether a *process* dependent upon living organisms and their life processes was patentable subject matter, the court had no doubts. In the last case cited in the above quotation, *Dick v. Lederle,* two years earlier the court had found a scarlet fever toxin and antitoxin and process of making the same to be patentable subject matter notwithstanding

the employment of life processes in their preparation. On appeal in the *Guaranty Trust* case, the Third Circuit Court of Appeals affirmed per curiam on the opinion of the trial judge, commenting, inter alia, that it had been persuaded "that the invention disclosed in the patent created a new and important commercial enterprise * * *." 61 F.2d at 1041.

These decisions illustrate what we believe to have been the state of the law ever since, namely, that *processes,* one of the categories of subject matter specified in § 101, are uniformly and consistently considered to be statutory subject matter notwithstanding the employment therein of living organisms and their life processes. Witness the action of the PTO in the present case in allowing the process claims. Other examples of such patentable process claims involving living bacteria are to be seen in the bacterial sewage treatment cases of which one is *City of Milwaukee v. Activated Sludge, Inc.,* 69 F.2d 577, 21 USPQ 69 (CA 7 1934). (See quoted claims 8 and 10 of reissue patent No. 15,140 in fn. 4.) A still earlier one is the *Cameron Septic Tank Co.* case cited in *Guaranty Trust* and decided by the Second Circuit Court of Appeals in 1908, wherein the trial court was reversed and bacterial-action process claims were held valid and infringed. (The original "septic tank.") It seems illogical to us to insist that the existence of life in a manufacture or composition of matter in the form of a biologically pure culture of a microorganism removes it from the category of subject matter which can be patented while the functioning of a living organism and the utilization of its life functions in processes does not affect their status under § 101.

### Inapplicability of Plant Protection Legislation

In our former *Bergy* opinion, we disposed of the plant patent legislation argument by saying:

Nor are we influenced by the legislative history of the Plant Patent Act of 1930 in the course of which nobody had anything to say about patent protection for mi-

croorganisms * * *. The collective mind of Congress was not turned in that direction.

Since the PTO solicitor made it clear on the reargument that the plant patent legislation is the *sole* basis on which the PTO contends for exclusion of the appealed inventions from § 101, and since our position was commented on in two dissenting opinions,[14] we now set forth in extenso the historical support for our earlier summary statement.

The PTO position places particular emphasis on the Plant Patent Act of 1930 (ch. 312, 46 Stat. 376, now codified as 35 U.S.C. § 161 et seq.), legislation directed specifically to plant breeders and conspicuous for its total inattention to anything other than the plant varieties of the type that Luther Burbank had then recently popularized. Nonetheless, both boards used that act to justify affirming the rejections of the claims in issue here, preliminarily over-generalizing the question in terms of whether a "living thing" is patentable subject matter, and then proceeding along the logic of this syllogism:

> [R.S. § 4886 did] * * * not specifically proscribe patents on plants, yet it was found necessary to enact a special section in order to reward horticulturists and agriculturists * * *.
>
> * * * We believe that the legislative history [of the Plant Patent Act] reveals a clear Congressional intent that *plants* were not covered by the *predecessor* of 35 U.S.C. 101.
>
> [Both plants and microorganisms are living organisms.]
>
> [Therefore,] * * * we do not believe that the terms "manufacture" or "composition of matter," as employed in 35 U.S.C. 101, were intended to encompass *any* living organisms, whether plants or the microorganism appellants are claiming here. [Emphasis ours.]

In analyzing the issue in this way, the PTO has made several errors. First, it ignored fundamental tenets of statutory construction accepted by the commentators and the Supreme Court; second, it failed to consider the explicit purpose of the Plant Patent Act; and, third, it misused portions of the legislative history of that act to substantiate propositions concerning living organisms generally, on which Congress itself had not spoken.

### 1. Statutory Construction

■ The principal mistake of the PTO was to look to the legislative history of the Plant Patent Act for evidence of the intent of a *previous* Congress, saying, in effect, that if Congress in 1930 passed an act extending patent protection to plant breeders, then Congress in 1874 must not have intended that "manufactures" and "compositions of matter" in R.S. § 4886 include *any* living organism. The violence done by this analysis resides in ascribing to a preceding Congress an intent that the members of that Congress did not themselves state. It is for this reason that the Supreme Court has consistently and unequivocally concluded that:

> "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."

*United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960); *accord, United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *United States v. Philadelphia National Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Rainwater v. United States,* 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); *United States v. United Mine Workers,* 330 U.S. 258, 281–82, 67 S.Ct. 677, 91 L.Ed. 884 (1947). In response to an argument remarkably similar to that made here by the PTO, the Supreme Court, in *Rainwater v. United States,* supra, 356 U.S. at 593, 78 S.Ct. at 949, rejected an invitation to interpret the meaning of an act of Congress by reliance on a later amending act with the following comment:

---

14. One of which opinions, after reargument, has now been abandoned and changed to a concurrence.

At most, the * * * amendment is merely an expression of how * * * [a later] Congress interpreted a statute passed by another Congress more than half a century before. Under these circumstances such interpretation has very little, if any, significance.

Significantly, the Court there noted the topic of primary concern to Congress, as evidenced by the express language and legislative history of the amendment, and observed that congressional action regarding that topic "is of little value in deciding the applicability" to the original act of subject matter related to, but not within the scope of, the amendment. *Id.* In the present cases we are similarly concerned with subject matter, microorganisms, only arguably related to, but clearly not within the scope of, the 1930 Plant Patent Act. We must recognize that the Plant Patent Act is, in this instance, "of little value in deciding the applicability" to microorganisms of 35 U.S.C. § 101, the successor statute to R.S. § 4886.

The improper use of legislative history by the PTO illustrates a reason for the concern of Justices Jackson and Frankfurter in *United States v. Public Utilities Commission of California,* 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 (1953), where they expressed the following apprehension:

[Courts should reach their decisions] by analysis of the statute instead of by psychoanalysis of Congress. When we decide from legislative history * * * what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them. * * * That process seems to me *not interpretation* of a statute *but creation* of a statute. [Emphasis ours.] [345 U.S. at 319, 73 S.Ct. at 719 (Jackson, J., *concurring*).]

Justice Frankfurter added:

It is one thing to construe a section of a comprehensive statute in the context of its general scheme, as that scheme is indicated by its terms and by the gloss of those authorized to speak for Congress, either through reports or statements on the floor. It is a very different thing to extrapolate meaning from *surmises and speculation and free-wheeling utterances,* especially to do so *in disregard of the terms in which Congress has chosen to express its purpose.* [Emphasis ours.] [345 U.S. at 321, 73 S.Ct. at 720 (Frankfurter, J., *concurring*).]

In the cases before us, the PTO has chosen to interpret the Plant Patent Act "in disregard of the terms in which Congress has chosen to express its purpose," in passing the act. As we will show, Congress expressed its purpose in terms of a desire to extend the benefits of the patent system to the field of agriculture. The PTO has engaged in pure speculation in using the Plant Patent Act of 1930 as evidence of the intent of a preceding Congress despite the total absence in that act's legislative history of any support for such a position. Such speculation cannot tell us what Congress intended by the terms "manufacture" or "composition of matter" when they were reenacted in 1874 into R.S. § 4886 (now in 35 U.S.C. § 101).

One further point on statutory construction merits attention. The solicitor argues in the *Chakrabarty* brief that we must read the 1930 amendments to R.S. § 4886 *in pari materia* with the statutory provision it amended. His point seems to be that the amendment is evidence that Congress did not intend to declare existing law, or clarify what was already includable in the expressions "manufacture" and "composition of matter" employed in R.S. § 4886, but rather intended to add to those categories a new class of statutory subject matter not within the compass of R.S. § 4886. As the PTO has done throughout this case, the solicitor over-generalizes Congress' intent to bring certain *plants* within the patent laws to the point where it is asserted that Congress intended for the first time to include *living things* within R.S. § 4886. He then proceeds to argue that specific terms in a statute prevail over general terms, citing *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), and concludes that the specific terms

of R.S. § 4886 relating to plants must be construed as the sole and exclusive provisions controlling what kinds of living organisms are patentable subject matter.

 We think the solicitor paints with too broad a brush. In our view, the specific terms of the 1930 amendment deal solely with asexually reproduced *plants,* and application of the principle stated in *Fourco Glass* leads only to the conclusion that only the types of *plants* there enumerated are statutory subject matter. As we shall show, the terms and legislative history of the 1930 amendment deal exclusively with agriculture, and aside from the few scattered casual remarks made concerning the subject of animate vs. inanimate things seized upon by the PTO as a toehold for its argument to the contrary, Congress was not at all concerned with the presence or absence of "life" in the plants with which it was concerned.[15]

 Additionally, we note that the approach to statutory construction employed in *Fourco Glass* represents an exception to the rule of construction that provisions of a statute should be harmonized if possible. The Supreme Court has stated that its task "is to give the act 'the most harmonious, comprehensive meaning possible' in light of the legislative policy and purpose." *Weinberger v. Hynson, Wescott & Dunning Co.,* 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); *accord, Federal Power Commission v. Panhandle Eastern Pipeline*

*Co.,* 337 U.S. 498, 514, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949). *See also* C. Sands, 2A *Statutes and Statutory Construction* § 51.05 at 315 (4th ed. 1973); 82 C.J.S. Statutes § 347 at 720 et seq. (1953). Elsewhere in this opinion we have indicated the established administrative practice of the PTO in allowing claims directed to living matter and life processes, which practice is entitled to weight as evidence of the meaning of a statute. *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). We think the plant provisions may be harmonized with the remainder of R.S. § 4886 by recognizing that the 1930 amendment dealt solely with asexually reproduced plants and that the remainder of that section had already been construed by the PTO to include living things other than plants. Thus we find the test in *Fourco Glass,* which says nothing to the contrary, to be inapplicable here.

To conclude, no doubt it is proper to look to the legislative history of the Plant Patent Act in construing *that act;* but looking at it to find the purpose and intent of a previous Congress, on the basis of the PTO's unfounded overstatement of what the purpose of the amending Congress was, is not even rational speculation. We turn, now, to the Plant Patent Act itself.

2. The Purpose of the Plant Protection Legislation

What Congress was trying to accomplish by the Plant Patent Act is clear. The PTO

---

15. Under the well-established principle of statutory construction, the words of a statute are to be given their common, ordinary meaning. *Columbia Water Power Co. v. Columbia Electric Street Railway Light and Power Co.,* 172 U.S. 475, 491, 19 S.Ct. 247, 43 L.Ed. 521 (1899); *accord, Woolford Realty Co. v. Rose,* 286 U.S. 319, 323, 52 S.Ct. 568, 76 L.Ed. 1128 (1932); *Old Colony Railroad Co. v. Commissioner of Internal Revenue,* 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484 (1932). While the term "plant" *taxonomically* includes many living organisms, most of these things are not included in the *common, ordinary* meaning of the term, which is limited to those things having roots, stems, leaves, and flowers or fruits. Our thorough examination of the express terms of the 1930 act, as well as its legislative history, confirms our belief that Congress was using the term in the common, ordinary sense just

defined, and was not at all concerned with living organisms generally. This court has already decided this very point. *See In re Arzberger,* 112 F.2d 834, 27 CCPA 1315, 46 USPQ 32 (1940). The strained, result-oriented analysis made by the PTO is merely an attempt to bootstrap its "living things" argument in order to place it within the purview of the 1930 act. Similarly, the partial definition of "plant" selected by the dissent at note 2 from the much longer definition in *Webster's Third New International Dictionary* 1731 (unab. 1971) encompasses far more than the common, ordinary meaning of the word with which the 1930 Congress dealt. The evident intent of Congress should not be obscured by deliberately over-refining the meaning of words where Congress has given no indication that it intended such meaning.

seems to have gone astray by generalizing the plants with which Congress was concerned into the broad category of "living organisms," with which Congress was totally unconcerned, and then proceeding to find in the legislative history nonexistent inferences about living organisms as a class, inclusive of everything not dead. The proper approach is to "give the statute effect in accordance with the purpose so clearly manifested by Congress." *Commissioner of Internal Revenue v. Bilder,* 369 U.S. 499, 504 n. 5, 82 S.Ct. 881, 884 n. 5, 8 L.Ed.2d 65 (1962).

■ The statute and its purpose are most accurately viewed from the point of historical perspective.[16] At the inception of the American patent system in 1790, the growth of the new country demanded a stimulus for the manufacture of all kinds of goods for the benefit of the public. This field of manufacturing was generally regarded as "industry"; its domain was the production of any and all things made by the hand of man. At the time, existing industry was not sufficient to supply even agriculture with its needs, which found itself with limitless land, a shortage of manpower, and a crying need for tools and machines.

In the mid-1800's, however, it became apparent that scientific principles could be applied to agriculture and horticulture, and, indeed, would necessarily someday have to be. Thus, in 1862 the Morrill Land Grant Act[17] established agricultural colleges in every state of the union, and agriculture and horticulture experiment stations to promote research were established under the Department of Agriculture, an offspring of the Patent Office and its first Commissioner, Ellsworth, who collected seeds at the Patent Office and distributed them throughout the country. 1840 Pat.Off. Report 2.

When the slow growth of American horticulture and agriculture was exacerbated by the general depression that struck the farming community in the early 1900's, action on Capitol Hill became intense as the farm lobby cried for relief. As a result, bills were proposed in Congress for support of horticulture and agriculture[18] through patent protection similar to that of the 1930 Plant Patent Act.[19]

Eventually, after Luther Burbank had dramatized the economic plight of the amateur horticulturists, the clamour in Congress for legislative help to plant breeders culminated in the Plant Patent Act of 1930. The statute was, in toto, an effort to apply the patent system where it had not been applied before in order to fuel the fire under plant breeding and to protect the experimenters in that as yet nonindustrial field. There were legal niceties to overcome—the product-of-nature rejection had already been applied by the Patent Office to pre-Burbank plants—but the purpose of Congress in passing the act is beyond doubt.

■ In this light, we turn to the express purpose of the Plant Patent Act, as set

---

**16.** "[S]tatutes are construed by the courts with reference to the circumstances existing at the time of the passage." *United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962).

**17.** Ch. 130, 12 Stat. 503 (1862).

**18.** H.R. 5435, 52d Cong., 1st Sess. (1892), A bill for the advancement of the science of agriculture.

H.R. 18851, 59th Cong., 1st Sess. (1906), A bill to amend the laws of the United States relating to patents in the interest of the originators of horticultural products.

S. 59, 60th Cong., 1st Sess. (1907), A bill to amend the laws of the United States relating to patents in the interest of the originators of horticultural products.

H.R. 21951, 60th Cong., 1st Sess. (1908), A bill to amend the laws of the United States relating to patents in the interest of the originators of horticultural products.

H.R. 24010, 61st Cong., 2d Sess. (1910), A bill to amend the laws of the United States relating to patents in the interest of originators of horticultural products.

**19.** Statements at the hearings on H.R. 18851, *id.,* indicate that identical purposes and problems were considered in 1906.

forth in the contemporaneous House and Senate Reports:[20]

## I. Purposes of the Bill

The purpose of the bill is to afford agriculture, so far as practicable, the same opportunity to participate in the benefits of the patent system as has been given industry, and thus assist in placing agriculture on a basis of economic equality with industry. The bill will remove the existing discrimination between plant developers and industrial inventors.

After this statement of purpose, both reports then commence discussions of "Stimulation of Plant Breeding," noting its embryonic state:

Today plant breeding and research is dependent, in large part, upon Government funds to Government experiment stations, or the limited endeavors of the amateur breeder.

*Id.* at 2. Thus, Congress had in mind the stimulation of a *field of endeavor* that, unlike chemistry, for example, had not as yet flowered into an industry. Hence, to "assist in placing agriculture on a basis of economic equality with industry," it extended the benefits of the patent system to these as yet nonindustrial plant breeders like Luther Burbank. What is crystal clear is the intent of Congress to extend the patent system to a *nonindustrial area,* ignoring completely the fact that plants were alive.

The committee reports and Congressional debates and hearings are replete with expressions indicating the perceived distinction between existing patent laws and the proposed Plant Patent bill to be in the *fields* of endeavor to which they were directed, the former to industrial pursuits, the latter to an art still in the research and experimental stage.[21] The unavoidable conclusion is that the purpose of Congress was precisely what Congress said it was—to offer to the useful art of *plant breeding* in the fields of horticulture and agriculture the benefits of the patent system that had theretofore been available only to industry.

The secondary purpose of the Plant Patent Act was to avoid the judicial interpretation which had been placed on then-existing patent laws that *products of nature* are not statutory subject matter. Until the time that Burbank made famous the art of plant breeding, plants were regarded as products of nature, unaffected by the hand of man, and thus not subject to patent protection.[22]

The state of the patent law with reference to plants is shown in *Ex Parte Latimer,* 1889 C.D. 123, 46 O.G. 1638 (Comr. 1889). Latimer claimed the fiber of the needle of the *Pinus australis* tree, the rejection of which claim the Commissioner of Patents affirmed as directed to a product of nature, as follows (p. 125):

It cannot be said that the applicant in this case has made any discovery, or is entitled to patent the idea, or fact, rather, that fiber can be found in the needle of the *Pinus australis,* or that it is a longer fiber than can be found in other leaves, or that it possesses more or less strength of fineness, because the mere ascertaining of the character or quality of trees that grow in the forest and the construction of the woody fiber and tissue of which they are composed is not a patentable invention, recognized by the statute, any more than to find a new gem or jewel in the earth would entitle the discoverer to patent all gems which should be subsequently found * * * . The result would be that * * * patents

20. S.Rep.No. 315, 71st Cong., 2d Sess. 1 (1930) and H.Rep.No. 1129, 71st Cong., 2d Sess. 1 (1930).

21. *See, e. g.,* the statement of sponsoring Congressman Purnell, Hearings on H.R. 11372 before the Committee on Patents, 71st Cong., 2d Sess. 2–3 (1930). We note that statements of the legislation's sponsor deserve substantial weight in interpreting the statute. *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976).

22. Wegner, *The Patentability of "New Manufactures"—The Living Invention,* "The Product of Nature of Early Days," supra note 10, at 274–80.

might be obtained upon the trees of the forest and the plants of the earth, which of course would be unreasonable and impossible.

\* \* \* \* \* \*

[The product here claimed] is a natural product and can no more be the subject of a patent in its natural state when freed from its surroundings than wheat which has been cut by a reaper or by some new method of reaping can be patented as wheat cut by such a process.

Until the time plant breeding began its growth, this was the controlling law in the Patent Office, and was apparently understood as such in both the legal and horticultural communities. In 1923, the commentator Thorne noted efforts to afford protection to plant propagators, but, after citing *Latimer* as "set[ting] forth the general stand taken in these matters" in the Patent Office, stated that "plants \* \* \* grow as natural products, and as such they are not discoveries which are subject to patentable [sic] protection." H. Thorne, *Relation of Patent Law to Natural Products*, 6 JPOS 23, 25 (1923). E. Stringham, in one of his many patent law texts, *Outline of Patent Law*, at 144 (1937), indicates at § 1226 under "product of nature" that a "growing plant, as such, or any part of it, is patentable, only to the extent of the new statute [the Plant Patent Act]," showing his appreciation that plants not propagated by man are natural products. In the horticultural field, Cook, Editor of the *Journal of Heredity* (which probably gave more attention to the plant patent idea than any other publication)[23] and author of a myriad of articles on the subject, commented:

> It is a little hard for plant men to understand why [Article 1, § 8] of the Constitution should not have been earlier construed to include the promotion of the art of plant breeding. The reason for this is probably to be found in the principle that natural products are not patentable.[24]

That the 71st Congress was aware of the past objection that plants were products of nature is evidenced by both the Senate and House Reports which dealt with this point extensively in "Legal Phases of the Bill." It concluded that the product-of-nature rejection would be inapplicable to asexually produced plants, stating:

> \* \* \* a plant discovery *resulting from cultivation is unique*, isolated, and is not repeated by nature, nor can it be reproduced by nature unaided by man \* \*.

> It is obvious that nature originally creates plants but it can not be denied *that man often controls and directs the natural processes* and produces a desired result. \* \* \*

> Furthermore, there is no apparent difference, for instance, between the part played by the plant originator in the development of new plants and the part played by the chemist in the development of new compositions of matter \* \* \*. [S.Rep. No. 315, supra, at 6–7.]

Following an objection raised during the House hearings by Secretary of Commerce Lamont that he seriously doubted that patents on plants *not bred* by man (i. e., found in nature and then cultivated by man) would be constitutional, "newly found" plants were deleted from the proposed statute. With that, the product-of-nature objection was avoided, and the way cleared for passage of the bill.

■ In support of the PTO position that in 1930 Congress was concerned with all living organisms, the solicitor points to the following quotation from Secretary of Agriculture Hyde, appearing in a letter included in the Senate and House Reports, S.Rep. at 9–10, H.Rep. at 10–11:

> [The purpose of this bill] is sought to be accomplished by bringing the reproduction of such newly bred or found plants under the patent laws which at the present time are understood to cover only inventions or discoveries in the field of inanimate nature.

---

**23.** R. Allyn, *The First Plant Patents*, at 58 (1934).

**24.** Florists Exchange and Horticultural Trade World (July 15, 1933), at 9.

We give no weight to Secretary Hyde's "understanding" of the law. There is no reason to attribute it to Congress. As the reports show, he wrote the letter because he was asked for his views on the proposed participation of his department in the *administration* of the new law since the bill proposed that his department cooperate with the Patent Office. To rely on his understanding is grasping at a straw.

Finally, we note another important reason for amending the statutes to permit patenting of plants. Under existing law, it was not seen how a plant could be described in a written document so as to comply with the written description requirement pertaining to "utility" patents. To solve this problem, section 4888 of the Revised Statutes, then in force, was amended by adding to the end, "No plant patent shall be declared invalid on the ground of noncompliance with this section if the description is made as complete as is reasonably possible." The substance of this sentence is today the first sentence of 35 U.S.C. § 162.

In this connection, we note further that while that provision was needed to secure protection to the plant breeders, no such modification of the statutes has ever been necessary to make possible the patenting of industrially useful microorganism inventions such as those of Bergy and Chakrabarty, which are readily so described and claimed as to comply with the written description and claiming provisions of 35 U.S.C. § 112.

■ We briefly mention the Plant Variety Protection Act of 1970 (7 U.S.C. § 2321 et seq.), which provides for "certificates of plant variety protection" to be issued by the Department of Agriculture to developers of "Soybeans * * * [and other] major U.S. crops, like cotton, wheat, barley, oats, and rice, for example * * *." That act was no more than an extension of protection to developers of plants that had been specifically excluded from the Plant Patent Act of 1930.

■ The 1930 act applies only to plants propagated by asexual reproduction. As was stated by Congressman Mayne in the House hearings on the 1970 act:

Those plants which reproduce asexually such as by budding and grafting have been covered by the patent law since 1930. There is no justification for not extending the same coverage to sexually reproduced plants. [Hearings H.R. 1290, 91st Cong., 2d Sess., 116 Cong.Rec. 40296 (1970).]

This clearly indicates that Congress was again concerned solely with plants. The 1970 act is cited by the PTO for the exclusion in 7 U.S.C. § 2402(a) of "fungi, bacteria, or first generation hybrids * * *." The question is, why? We agree with Chakrabarty's rational explanation that the exclusion from protected varieties in § 2402(a) was merely the legislative recognition of this court's ruling in *In re Arzberger*, 112 F.2d 834, 27 CCPA 1315, 46 USPQ 32 (1940), which interpreted the Plant Patent Act of 1930 to include only plants in the layman's sense and not the bacterium for which Arzberger unsuccessfully sought protection *as a plant* under *that act*. Our reading of the Plant Variety Protection Act of 1970 provides no support for the PTO's reasoning. The solicitor's use of it suffers from the same flaw as does his use of the Plant Patent Act; it cannot be used to attribute to a preceding Congress, the 82d Congress that passed the 1952 patent act, an intent not expressed by that Congress. There is not a word in either Title 35, United States Code, or in its legislative history, which supports the assertion that the 82nd Congress had in mind a general distinction between living and non-living subject matter. The 1970 act was no more concerned with living things in general than was the 1930 amendment to R.S. § 4886.

### This Decision Does Not "Extend" the Patent Laws

"The sky is falling, the sky is falling!" cried Chicken Little. The CCPA is indulging in "wholesale judicial legislation," says the solicitor, by "extending" the patent laws to "encompass living organisms—life itself." Come, let us return to reason. The

solicitor himself tells us the precise question we have here is one of first impression *in the courts.* While that is probably so, the fact that it has not come to a court before in this precise form does not mean that it has never before been considered where it matters—in the PTO. We shall presently show how the PTO has regularly been issuing patents on non-process inventions involving "life itself," even, potentially, in the cases before us now, apart from the appealed claims. Being a case of first impression in the courts means that there is no prior precedent to be extended or overruled, as there was in *Deepsouth,* previously discussed.

With similar hyperbole, the *Bergy* petition for certiorari says that since "the number of living things is vast," our prior decision in that case "opens an enormous range of subject matter to patentability," and threatens that, unless reversed, "the policy problems of genetic engineering, already controversial, will be further complicated by crystallized patent considerations," whatever that may mean. From our modest exposure to the realities of the patent system we judge the range of subject matter open to patentability to be enormous in any case. It is heartening to think how many useful things may yet be invented and we are not moved to be restrictive in our interpretation of § 101 by mere numbers. An appropriate rejoinder we think is, "The more the better." Chemical compounds, to take an example, presumed "dead" though very active in various environments, have unquestionably always been regarded as both "manufactures" and "compositions of matter," yet we have never heard that their possible number is other than infinite. When we examine "living" cells, it appears that they too are chemical compounds assembled in infinite complexity with an added facility for replication. From the standpoint of construing the patent statutes, we do not see, and the PTO has not shown us, *any sound reason* for making the distinction it seeks to make here between the living and the dead. Its arguments are mere lawyers' techniques to support an a priori conclusion.

With respect to past PTO construction of the word "manufacture" in the statute, Genentech's amicus brief informs us that Louis Pasteur in 1873 obtained United States patent 141,072 containing this claim:

2. Yeast, free from organic germs of disease, as an article of manufacture.

Yeast is alive, else we would not have beer and bread would not rise. The law's statement of categories of inventions which *may* be patentable was the same in 1873 as it is today.

The Patent, Trademark, and Copyright Research Institute of the George Washington University, formerly affiliated with its law school, published a quarterly called IDEA. In 10 IDEA 87 (1966), a student paper was published entitled *Microbiological Plant Patents,* by Daus, Bond, and Rose. The authors were all Assistant Examiners in the United States Patent Office. The paper was a critical examination of this court's decision in *In re Arzberger,* 112 F.2d 834, 27 CCPA 1315, 46 USPQ 32 (1940). At page 94 they stated, "The existence of patents drawn to living organisms and cultures used in foods, insecticides, et cetera, is indicated in the footnote below." We reproduce the footnote in pertinent part (emphasis ours):

[36] The following are typical of living matter patented as compositions of matter and are by no means exhaustive: (The number of the patent, its month of issue, the patentee and the Patent Office classification are given in that order).

1) Bacteria
3,133,066 12–1963 Emond 167–13
Claims 1 and 2 are drawn to composition containing oil and *Bacillus thuringiensis* spores. Reference to the patent file indicates emphasis on the living character of the composition, and of synergistic effects.

2) Yeasts
2,919,194 12–1959 Johnston 99–96
Claim 21 is drawn to dry baker's viable yeasts comprising the yeast, less than 8% moisture.

3) Yeast and Bacteria
1,894,135 1–1933 Torok *et al.* 99–96
Claim 10 is drawn to "a yeast preparation containing lactic acid separated from their nutrient medium."

4) Mushroom mycellia ("spawn")
2,262,851 11–1941 Lescarboura 47–111
Claims 1–10 are drawn to pulps overgrown with mushroom mycellium.

5) Virus
2,271,819 2–1942 Green 167–78
Claims 3 and 4 are drawn to a distemper virus vaccine described by the process for its production.
2,518,978 8–1950 Cox *et al.* 167–80
Claim 5 is drawn to a hog cholera virus developed by a specified process.
2,966,433 12–1960 Cox 167–78
Claims 1 and 2 are drawn to live polio viruses made by a specified process.

6) Plant seeds
3,080,285 3–1963 Openwald, *et al.* 167–65
Claims 1–4 are drawn to seed covered with medication.

7) Eggs
3,088,865 5–1963 Wernicoff *et al.* 167–531
Claim 8 is drawn to an egg treated by the method of addition of hormones.

8) Eggs plus bacteriophages
2,851,006 9–1958 Taylor *et al.* 119–1
Claims 1–8 are drawn to eggs inoculated with *Salmonella* phages (a virus which attacks *Salmonella* bacteria), providing resistance thereto.

It is not possible to reconcile the assertion that we are "expanding" patent law to cover living things with the PTO's issuance of the foregoing patents. Neither is it possible to reconcile the contention with the performance of the PTO in the very cases before us.

We quoted Chakrabarty's *allowed* claim 30 above (p. 45). In simplified terms, the invention it defines is a "carrier" which will float on water and the bacterium Chakrabarty invented, as defined in rejected claim 7 (p. 44), "carried thereby." To simplify matters further, we pointed out that the preferred carrier described in the specification is straw. *Allowed* claim 31 reads "The innoculated medium of claim 30 wherein the carrier medium is straw." Thus, the PTO is willing to issue a patent with claims to Chakrabarty's new bacterium carried on straw. The bacterium is just as much *alive* when carried on straw as when it is by itself or carried in a bottle. Is not such a patent on a "living thing"? But is it a patent on "life itself"? Certainly not. Presumably the PTO considers the subject matter of all of the allowed claims to be within § 101, or it could not have allowed them. The PTO does, therefore, treat § 101 as inclusive of "living things," whether or not some members of the board think it should be otherwise. *Excluding* all of them from § 101 *is* to change the law.

In *Bergy's* case, all of his *allowed* claims define processes in which a living organism is the active force which causes the process to proceed. As we said above, we do not see the logic of allowing claims to processes which depend for their operation on a living organism while denying claims to the organism or a pure culture of it *merely* because it is alive.

One final point on "extension" arises because the *Bergy* petition for certiorari (p. 7) states:

> As this court stressed in *Gottschalk v. Benson,* 409 U.S. 63, 72–73 [93 S.Ct. 253, 34 L.Ed.2d 273] policy decisions concerning the extension of the patent laws to *new fields* are for Congress, not the Courts. Accordingly, where *new technologies* are involved it is particularly important for the courts to interpret the patent laws so that "the prerequisites to obtaining a patent are strictly observed." [Emphasis ours.]

Apart from the fact that patentable inventions in general are related to new fields and new technologies, a sufficient answer is found in the solicitor's admissions at oral argument on remand that "the technology in a very broad sense is very old"; "The technology here is not new, it is old"; and "We're not talking about new technologies here." Moreover, *Benson* was discussing computer software or program patentability, a subject on which the President's Commission on the Patent System had made a recommendation, suggesting there should be no patents on "programs," and the Court had observed "technological problems" in patenting such inventions. No such problems in examining inventions like those of the appealed claims have been suggested. The PTO has been handling them for years. They are easier to handle than many "chemical" cases.

We will comment briefly on the PTO suggestion that we are "legislating," deciding these cases on our own notions of public policy, *determination* of which should be left to Congress, and that we should not reverse these two board decisions without a positive "signal" from Congress that it is in

accord with its desires. We think the facts speak for themselves. Admittedly, this is a case of first impression in the courts, which means, simply, that this court *has* to decide whether the biologically pure culture of Bergy and the newly created bacterium of Chakrabarty do or do not fall within the term "manufacture" or the term "composition of matter" in § 101. If the statute is not clear, if there is any room for "interstitial judicial legislation" by us, it is certainly still our duty *to make a decision.* But we find the statute clear on its face and have no difficulty in finding the claims to be within the statutory terms. The terms are broad: "any * * * manufacture, or composition of matter." If we had any doubt about the propriety of giving those words a broad interpretation, it would be dispelled by the identical statement in the House and Senate reports accompanying the 1952 reenactment, quoted supra, that "a machine, or a manufacture * * * may include *anything under the sun that is made by man.*" (Emphasis ours.)[25] That certainly suffices to dispose of the *Bergy* board's "view that 35 U.S.C. 101 must be strictly construed." That leaves no interstices. As for "wholesale judicial legislation," the assertion falls by the weight of its own extremism.

Faced with the necessity of rendering a decision one way or the other on whether these inventions are encompassed by § 101, there being no prior decisions to guide us, we merely carry out our normal judicial function in deciding to say yes rather than no. We look at the facts and see things that do not exist in nature and that are man-made, clearly fitting into the plain terms "manufacture" and "compositions of matter." We look at the statute and, plainly, it appears to include them. We look at its legislative history and are confirmed in that belief. We consider what the patent statutes are intended to accomplish and the Constitutional authorization, and it appears

to us that protecting these inventions, in the form claimed, by patents will promote progress in very useful arts. When we merely *determine* the policy underlying a statute we are not *making* policy. The policy was established by the Founding Fathers and by Congress long ago. Our "notions" of what it is are derived from the study of legal history wherein we find our "signals."

■ Rather, it seems to us, it is the PTO, not this court, that is attempting to legislate. It may have reasons for not wanting to examine the appealed claims for patentability under §§ 102 and 103, but if so, it has not revealed them. (It did have such reasons in the case of computer programs, and made the most of them.) For whatever reason, it decided to reject, first on one ground and then on another, and then set out, lawyerlike, to devise unduly exaggerated justifications spiced with bits and pieces from wholly unrelated plant-patent legislation from nearly half a century ago. We think the Supreme Court gave us our "signal" in *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 199, 53 S.Ct. 554, 561, 77 L.Ed. 1114 (1933), where it said:

> We should not read into the patent laws limitations and conditions which the Legislature has not expressed.

## DECISION

### *Appeal No. 76–712*

The decision of the board affirming the rejection of claim 5 of Bergy et al. application serial No. 477,766 is *reversed.*

### *Appeal No. 77–535*

The decision of the board affirming the rejection of claims 7–9, 13, 15, 17, 21, and 24–26 of Chakrabarty application serial No. 260,563, is *reversed.*

*REVERSED.*

---

**25.** We recognize that, at the time the statement was made, its authors realized that Congress did not intend the term "manufacture" in § 101 to include plants, which were specifically provided for elsewhere. It is with this in mind that we take the quoted statement as an expression of congressional will that the term "manufacture" otherwise be given the broadest possible interpretation.

988

BALDWIN, Judge, concurring.

Although I agree with portions of the majority opinion, I do not subscribe to the view stated therein that the Supreme Court's opinion in *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451, 198 USPQ 193 (1978), has no bearing on these appeals. It is only after reconsidering the subject matter of these appeals in the light of the precedents cited in the *Flook* opinion that I modify my former position and now concur in the result reached by the majority.

The words of 35 U.S.C. § 101, in defining areas of patentable subject matter, are quite clear on their face. This statute, while not as sweeping as its constitutional basis, is expansive in its scope. Indeed, the words of both the Senate and House Reports on the Act indicate that § 101 is to "include anything under the sun that is made by man."[1] Complementary to this concept is the fact that the Patent Act was intended to be, generally, a codification of the law as it existed in 1952.[2] In the context of § 101, the law was not drawn on a clean slate. Although this section pertains to *any* invention belonging to one of the listed classes of subject matter, decisions of the Supreme Court preclude a literal interpretation of the section.

These Supreme Court decisions have noted certain categories of subject matter that, although falling within the dictionary definitions of process, manufacture or composition of matter, nonetheless do *not* comprise statutory subject matter. The Court's opinion in *Parker v. Flook,* supra, explores the rationales behind these judicially-created exceptions and provides citations to other decisions of the Court which are particularly germane to the appeals before us. These cases include *O'Reilly v. Morse,* 56 U.S. (15 How.) 61, 14 L.Ed. 601 (1853); *Le Roy v.*

*Tatham,* 55 U.S. (14 How.) 156, 14 L.Ed. 367 (1852); *Tilgham v. Proctor,* 102 U.S. 707, 26 L.Ed. 279 (1880); *Eibel Process Co. v. Minnesota and Ontario Paper Co.,* 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); *Mackay Radio & Telegraph Co. v. Radio Corp. of America,* 306 U.S. 86, 59 S.Ct. 427, 83 L.Ed. 506 (1939); and, *Funk Brothers Seed Co. v. Kalo Inoculant Co.,* 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948).

Although many of these decisions are far removed in time, and involve crude technologies when compared to those of Bergy and Chakrabarty, the opinions supporting these decisions voice a concern of the Supreme Court that a patentee not obtain an effective monopoly over that which is called, for the lack of a more precise term, "a principle or phenomenon of nature." The common thread throughout these cases is that claims which directly or indirectly preempt natural laws or phenomena are proscribed, whereas claims which merely utilize natural phenomena via explicitly recited manufactures, compositions of matter or processes to accomplish new and useful end results define statutory inventions.

In tracing this common thread, I will present not only extensive quotations from the bodies of the Court's opinions, but also the respective claims and avowed inventions. This assures that the Court's explanations are not taken out of context and are read with full knowledge of the fact patterns facing the Court in each case.

One of the first Supreme Court opinions to consider this concept of phenomena of nature was *O'Reilly v. Morse,* supra, which arose from Morse's claim to be the first inventor of the telegraph. The portion of the Court's long opinion which is relevant here is its consideration of the validity of Morse's 1840 patent which had been reis-

1. *See* H.R. Rep. No. 1923, 82d Cong., 2d Sess. 6 (1952); S.Rep. No. 1979, 82d Cong., 2d Sess. 5 (1952), U.S.Code Cong. & Admin.News 1952, p. 2399.

2. *See generally,* the Supreme Court's discussion in *Graham v. John Deere,* 383 U.S. 1, 3, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 461 (1966). Additionally, Chairman Bryson's com-

ments (discussing, *inter alia,* § 101 and inventions involving principles of nature) in Patent Law Codification and Revision: Hearings on H.R. 3760 before Subcomm. No. 3 of the House Comm. on the Judiciary, 82d Cong., 1st Sess. 121 (1951), specifically noted that "[t]here is no intention to change the law as it is presently written; the purpose is just to make it clearer."

sued in 1848. The reissued patent contained eight claims; the first, third and eighth claims are as follows:

"First. Having thus fully described my invention, I wish it to be understood that I do not claim the use of the galvanic current, or current of electricity, for the purpose of telegraphic communications, generally; but what I specially claim as my invention and improvement, is making use of the motive power of magnetism, when developed by the action of such current or currents, substantially as set forth in the foregoing description of the first principal part of my invention, as means of operating or giving motion to machinery, which may be used to imprint signals upon paper or other suitable material, or to produce sounds in any desired manner, for the purpose of telegraphic communication at any distances.

"The only ways in which the galvanic currents had been proposed to be used, prior to my invention and improvement, were by bubbles resulting from decomposition, and the action or exercise of electrical power upon a magnetized bar or needle; and the bubbles and deflections of the needles, thus produced, were the subjects of inspection, and had no power, or were not applied to record the communication. I therefore characterize my invention as the first recording or printing telegraph by means of electro-magnetism.

"There are various known modes of producing motion by electro-magnetism, but none of these had been applied prior to my invention and improvement, to actuate or give motion to printing or recording machinery, which is the chief point of my invention and improvement.

"Third. I also claim, as my invention and improvement, the combination of machinery herein described, consisting of the generation of electricity, the circuit of conductors, the contrivance for closing and breaking the circuit, the electro-magnet, the pen or contrivance for marking, and the machinery for sustaining and moving the paper, altogether constituting one apparatus of telegraphic machinery, which I denominate the American Electro-Magnetic Telegraph.

"Eighth. *I do not propose to limit myself to the specific machinery, or parts of machinery,* described in the foregoing specifications and claims; *the essence of my invention being the use of the motive power of the electric or galvanic current,* which I call electro-magnetism, however developed, *for making or printing intelligible characters, letters, or signs,* at any distances, being *a new application of that power,* of which I claim to be the first inventor or discoverer." [Emphasis ours. *Id.* 56 U.S. (15 How.) at 84–5.]

The Court perceived a clear distinction between claim 8, wherein Morse attempted to escape any apparatus limitations on his invention, and the preceding seven claims, and stated:

We perceive no well-founded objection to the description which is given of the whole invention and its separate parts, nor to his right to a patent for the first seven inventions set forth in the specification of his claims. The difficulty arises on the eighth.

\* \* \* \* \* \*

It is impossible to misunderstand the extent of this claim. He claims the exclusive right to every improvement where the motive power is the electric or galvanic current, and the result is the marking or printing intelligible characters, signs, or letters at a distance.

If this claim can be maintained, it matters not by what process or machinery the result is accomplished. For aught that we now know some future inventor, in the onward march of science, may discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in the plaintiff's specification. His invention may be less complicated—less liable to get out of order—less expensive in construction, and in its operation. But yet if it is covered by this patent the inventor could not use it, nor the public have the benefit of it without the permission of this patentee.

Nor is this all, while he shuts the door against inventions of other persons, the patentee would be able to avail himself of new discoveries in the properties and powers of electro-magnetism which scientific men might bring to light. For he says he does not confine his claim to the machinery or parts of machinery, which he specifies; but claims for himself a monopoly in its use, however developed, for the purpose of printing at a distance. New discoveries in physical science may enable him to combine it with new agents and new elements, and by that means attain the object in a manner superior to the present process and altogether different from it. And if he can secure the exclusive use by his present patent he may vary it with every new discovery and development of the science, and need place no description of the new manner, process, or machinery, upon the records of the patent office. And when his patent expires, the public must apply to him to learn what it is. In fine he claims an exclusive right to use a manner and process which he has not described and indeed had not invented, and therefore could not describe when he obtained his patent. The court is of opinion that the claim is too broad, and not warranted by law. [Footnotes omitted. *Id.* at 112–3.]

Although the Court did not use the words "phenomenon of nature," it is apparent that claim 8 was held improper because by disclaiming all apparatus limitations, Morse was attempting to define the limits of his invention in terms of the natural phenomenon of electromagnetism and would, therefore, preempt the use of this phenomenon. The remaining claims, however, defined particular manufactures which employed this same phenomenon to accomplish new and useful end results. The Court voiced no objection to these claims.

Preceding *O'Reilly v. Morse*, the Court decided *Le Roy v. Tatham*, supra. The invention in *Le Roy* concerned the manufacture of lead pipes. Evidently, at the time of Le Roy's invention, lead pipes were made by casting the pipe in pieces and then welding the pieces together. Pipes manu-

factured in this manner had the undesirable characteristic of leaking at the welds. The pipe made by Le Roy differed in that it was wrought by heat, pressure and constriction from solidified metal and not by casting in a mold. Le Roy and his coinventor claimed their invention as follows:

"We do not claim as our invention and improvement, any of the parts of the above-described machinery, independently of its arrangement and combination above set forth. What we do claim as our invention, and desire to secure, is, the combination of the following parts above described, to wit: the core and bridge, or guide-piece, with the cylinder, the piston, the chamber and the die, when used to form pipes of metal, under heat and pressure, in the manner set forth, or in any other manner substantially the same." [*Id.* 55 U.S. (14 How.) at 172.]

The controversy before the Court arose from an alleged infringement of the claim, and specifically at issue was the following instruction by the lower court to the jury:

[T]he originality [of Le Roy's invention] did not consist in the novelty of the machinery, but in bringing a newly discovered principle into practical application, by which a useful article of manufacture is produced, and wrought pipe made as distinguished from cast pipe. [*Id.* at 174.]

In discussing the claim in view of the jury instruction, the Court made the following statements concerning why natural phenomena, per se, are not proper subjects for patents and then discoursed on the types of discoveries and inventions that are properly subject to patenting:

The word *principle* is used by elementary writers on patent subjects, and sometimes in adjudications of courts, with such a want of precision in its application, as to mislead. It is admitted, that a principle is not patentable. A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right. Nor can an exclusive right exist to a new power,

should one be discovered in addition to those already known. Through the agency of machinery a new steam power may be said to have been generated. But no one can appropriate this power exclusively to himself, under the patent laws. The same may be said of electricity, and of any other power in nature, which is alike open to all, and may be applied to useful purposes by the use of machinery.

In all such cases, the processes used to extract, modify, and concentrate natural agencies, constitute the invention. The elements of the power exist; the invention is not in discovering them, but in applying them to useful objects. Whether the machinery used be novel, or consist of a new combination of parts known, the right of the inventor is secured against all who use the same mechanical power, or one that shall be substantially the same.

A patent is not good for an effect, or the result of a certain process, as that would prohibit all other persons from making the same thing by any means whatsoever. This, by creating monopolies, would discourage arts and manufacturers, against the avowed policy of the patent laws.

A new property discovered in matter, when practically applied, in the construction of a useful article of commerce or manufacture, is patentable; but the process through which the new property is developed and applied, must be stated, with such precision as to enable an ordinary mechanic to construct and apply the necessary process. This is required by the patent laws of England and of the United States, in order that when the patent shall run out, the public may know how to profit by the invention. It is said, in the case of the *Household Company v. Neilson*, 1 Webs. Pat. Cas., 683, "A patent will be good, though the subject of the patent consists in the discovery of a great, general, and most comprehensive principle in science or law of nature, if that principle is by the specification applied to any special purpose, so as thereby to effectuate a practical result and bene-

fit not previously attained." [*Id.* at 174–5.]

The Court held that the jury instruction was erroneous because a combination of machinery was indeed claimed, and "[t]he question whether the newly-developed property of lead, used in the formation of pipes, might have been patented, if claimed as developed, without the invention of machinery, was not in the case." *Id.* at 176. Thus, although the Court recognized that Le Roy's invention was based upon and implemented a newly discovered but naturally occurring phenomenon of lead, the claim did not directly or indirectly preempt the phenomenon because it was expressly limited to the claimed apparatus.

The Supreme Court next addressed the patentability of a natural phenomenon in *Tilghman v. Proctor*, supra. This case concerned an alleged infringement of Tilghman's patent for a process of separating fats and oils into their component parts. In particular, Tilghman had discovered that a desirable separation could be accomplished by mixing the fats and oils with water and then subjecting the mixture to high pressures at high temperatures. Tilghman's patent claim reads as follows:

Having now described the nature of my said invention, and the manner of performing the same, I hereby declare that I claim, as of my invention, the manufacturing of fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure. [*Id.* 102 U.S. at 709.]

The accused infringer argued that Tilghman's patent was invalid because it claimed a natural phenomenon, i. e., that heat, water and pressure can dissolve fat.

In addressing this argument, the Court distinguished between Tilghman's discovery and his claims:

What did Tilghman discover? And what did he, in terms, claim by his patent? He discovered that fat can be dissolved into its constituent elements by the use of water alone under a high degree of heat and pressure; and he patented *the proc-*

ess of "manufacturing fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure." [*Id.* at 721. Emphasis in original.] The Court next considered the proper interpretation of *O'Reilly v. Morse,* supra, and the effect of that decision on the patentability of machines and processes which employ natural phenomena to produce new and useful results. The Court stated:

We think that a careful examination of the judgment in that case will show that nothing adverse to patents for processes is contained in it. The eighth claim of Morse's patent was held to be invalid, because it was regarded by the court as being not for a process, but for a mere principle. It amounted to this, namely, a claim of the exclusive right to the use of electro-magnetism as a motive power for making intelligible marks at a distance; that is, a claim to the exclusive use of one of the powers of nature for a particular purpose. It was not a claim of any particular machinery, nor a claim of any particular process for utilizing the power; but a claim of the power itself,—a claim put forward on the ground that the patentee was the first to discover that it *could* be thus employed. This claim the court held could not be sustained. [*Id.* at 726–7. Emphasis in original.]

The Court continued by quoting the *Morse* opinion as follows:

After reviewing the statutes and decisions bearing upon the subject, the Chief Justice makes a summary conclusion of the whole matter, as follows: "Whoever discovers that a certain useful result will be produced, in any art, machine, manufacture, or composition of matter, by the use of certain means, is entitled to a patent for it; provided he specifies the means he uses in a manner so full and exact that any one skilled in the science to which it appertains can, by using the means he specifies, without any addition to or subtraction from them, produce precisely the result he describes. And if this cannot be done by the means he describes, the patent is void. And if it can be done, then the patent confers on him

the exclusive right to use the means he specifies to produce the result or effect he describes, and nothing more. And it makes no difference, in this respect, whether the effect is produced by chemical agency or combination; or by the application of discoveries or principles in natural philosophy, known or unknown before his invention; or by machinery acting altogether upon mechanical principles. In either case, he must describe *the manner or process* as above mentioned, and the end it accomplishes. And any one may lawfully accomplish the same end without infringing the patent, if he uses means substantially different from those described." [*Id.* at 727 quoting 15 How. at 118–9. Emphasis in original.]

In applying these principles to Tilghman's claim, the Court stated:

In the first place, the claim of the patent is not for a mere principle. The chemical principle or scientific fact upon which it is founded is, that the elements of neutral fat require to be severally united with an atomic equivalent of water in order to separate from each other and become free. This chemical fact was not discovered by Tilghman. He only claims to have invented a particular mode of bringing about the desired chemical union between the fatty elements and water. He does not claim every mode of accomplishing this result. [*Id.* at 729.]

Since the Court did not find the claim to monopolize the natural phenomenon, the claim was held valid.

In *Eibel Process Co. v. Minnesota & Ontario Paper Co.,* supra, the Court considered the validity of a patent for an improved apparatus for making newspaper stock. The patentee, Eibel, discovered that the speed of a well-known papermaking machine could be significantly increased by employing the force of gravity. This was accomplished by elevating one end of the device so that the flow rate of the stock would be increased by causing it to flow downhill. Claim 1 is representative of the claims in the patent, and reads:

1. A Fourdrinier machine having the breast roll end of the paper-making wire

maintained at a substantial elevation above the level, whereby the stock is caused to travel by gravity, rapidly, in the direction of movement of the wire, and at a speed approximately equal to the speed of the wire, substantially as described. [*Id.* 261 U.S. at 50; 43 S.Ct. at 324.]

The validity of the claims was not challenged on the grounds that they improperly monopolized the natural phenomenon of gravity and the case is often cited approvingly as an example of the proper use of a natural phenomenon to produce a new and useful end result. *See Parker v. Flook,* supra.

The Court next considered a patent based upon a natural phenomenon in *Mackay Radio & Telegraph Co. v. Radio Corp. of America,* supra, which concerned the alleged infringement of a number of patents. One of the patents alleged to be infringed was for an antenna system which utilized principles of electro-magnetic wave propagation and the phenomenon of standing waves to produce new and useful results. The phenomenon was describable by a mathematical formula which appeared in the claims as follows:

15. An antenna comprising a pair of relatively long conductors disposed with respect to each other at an angle substantially equal to twice

$$50.9 \left(\frac{l}{\lambda}\right)^{-0.513}$$

degrees, $l$ being the length of the wire and $\lambda$ the operating wave length in like units, and means in circuit with said antenna for exciting the conductors in phase opposition whereby standing waves of opposite instantaneous polarity are formed on the conductors throughout their length. [*Id.* 306 U.S. at 96, n. 4, 59 S.Ct. at 431–2 n. 4.]

The formula expressed the physical relationship of two conductors in the assembled antenna. That the Court considered this to be a proper claim to the use of a natural phenomenon and not a preemption of the phenomenon itself, is evident from the following passage from the opinion:

While a scientific truth, or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be. * * * We assume * * * that this advance was invention even though it was achieved by the logical application of a known scientific law to a familiar type of antenna. But it is apparent that if this assumption is correct the invention was a narrow one, consisting of a structure conforming to the teachings of the Abraham formula as to angle and wire length relative to wave length, and is to be strictly construed with regard both to prior art and to alleged infringing devices. [*Id.* at 94, 59 S.Ct. at 431.]

In *Funk Brothers Seed Co. v. Kalo Inoculant Co.,* supra, the Court considered the validity of a patent to one Bond and the alleged infringement of a number of the patent's product claims. The subject matter involved certain naturally occurring bacteria of the genus *Rhizobium* which infect the roots of leguminous plants and form nodules thereon hence enabling the plants to transform atmospheric nitrogen into organic nitrogenous compounds necessary for plant growth. It was well known that each species of these naturally occurring bacteria would only infect certain species of leguminous plants. Attempts (prior to Bond's work) to produce a useful mixture of bacteria, which farmers could use upon planting more than a single variety of plant, were unsuccessful. When mixed, different species of *Rhizobium* bacteria exhibited a mutually inhibiting effect and no suitable mixture had, therefore, been produced. Bond discovered that certain strains of the bacteria were not mutually inhibitive and he produced mixtures of the *Rhizobium* bacteria which mixtures were capable of inoculating multiple varieties of plants. Bond was granted a patent on his discovery. The Supreme Court found the following claim to be representative of Bond's invention:

An inoculant for leguminous plants comprising a plurality of selected mutual-

ly non-inhibitive strains of different species of bacteria of the genus Rhizobium, said strains being unaffected by each other in respect to their ability to fix nitrogen in the leguminous plant for which they are specific. [*Id.* 333 U.S. at 128, n. 1, 68 S.Ct. at 440.]

Justice Douglas, speaking for a majority of the Court, said the following about Bond's claimed invention:

We do not have presented the question whether the methods of selecting and testing the non-inhibitive strains are patentable. We have here only product claims. Bond does not create a state of inhibition or of non-inhibition in the bacteria. Their qualities are the work of nature. Those qualities are of course not patentable. For patents cannot issue for the discovery of the phenomena of nature. See *Le Roy v. Tatham*, 14 How. 156, 175. The qualities of these bacteria, like the heat of the sun, electricity, or the qualities of metals, are part of the storehouse of knowledge of all men. They are manifestations of laws of nature, free to all men and reserved exclusively to none. He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. It there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end. See *Telephone Cases*, 126 U.S. 1, 532–533 [8 S.Ct. 778, 780, 781, 31 L.Ed. 863]; *DeForest Radio Co. v. General Electric Co.*, 283 U.S. 664, 684–685 [51 S.Ct. 563, 568, 569, 75 L.Ed. 1339]; *Mackey Radio & Tel. Co. v. Radio Corp.*, 306 U.S. 86, 94 [59 S.Ct. 427, 431, 83 L.Ed. 506]; *Cameron Septic Tank Co. v. Saratoga Springs* [2 Cir.,] 159 F. 453, 462–463. The Circuit Court of Appeals thought that Bond did much more than discover a law of nature, since he made a new and different composition of non-inhibitive strains which contributed utility and economy to the manufacture and distribution of commercial inoculants. But we

think that that aggregation of species fell short of invention within the meaning of the patent statutes.

Discovery of the fact that certain strains of each species of these bacteria can be mixed without harmful effect to the properties of either is a discovery of their qualities of non-inhibition. It is no more than the discovery of some of the handiwork of nature and hence is not patentable. The aggregation of select strains of · the several species into one product is an application of that newly-discovered natural principle. But however ingenious the discovery of that natural principle may have been, the application of it is hardly more than an advance in the packaging of the inoculants. Each of the species of root-nodule bacteria contained in the package infects the same group of leguminous plants which it always infected. No species acquires a different use. *The combination of species produces no new bacteria, no change in the six species of bacteria, and no enlargement of the range of their utility. Each species has the same effect it always had. The bacteria perform in their natural way. Their use in combination does not improve in any way their natural functioning. They serve the ends nature originally provided and act quite independently of any effort of the patentee.* [*id.* at 130–1, 68 S.Ct. at 441–2. Emphasis added.]

The Court held that "the product claims do not disclose an invention or discovery within the meaning of the patent statute." *Id.* at 132, 68 S.Ct. at 442. This holding appears to arise, in part, from Bond's manner of claiming his invention, i. e., in terms of its property—non-inhibition—instead of claiming the precise constituent elements of his mixtures. The effect is an indirect, but nonetheless effective, monopoly over the phenomenon because the test for inclusion of a strain within the claim limits is the existence of the phenomenon.[3]

3. Both *Funk* and *Cameron Septic Tank Co. v. Saratoga Springs*, 159 F. 453 (2d Cir. 1908), (cited approvingly in *Funk*, 333 U.S. at 130, 68

S.Ct. 440), concerned patents which involved living bacteria. The fact that the bacteria were alive was not raised as a grounds for invalidity

Although the Supreme Court has considered the question of patentable subject matter in other cases both before and after the 1952 Act, *see e. g., Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273, 175 USPQ 673 (1972), the cases cited above comprise the ' precedential background of the Court's decision in *Parker v. Flook,* supra, and they trace the development of the judicial proscription on the patentability of purely natural phenomenon.

In *Flook,* the applicant presented claims to a method for computing and updating certain alarm limits critical to the catalytic conversion process of hydrocarbons. The essential feature of the process as claimed was a new mathematical formula for computing the values of the alarm limits from certain input quantities. The Court indicated that a formula is similar to a principle or law of nature and it quoted from the *Benson* opinion:

"A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right." *Le Roy v. Tatham,* 14 How. 156, 175 [14 L.Ed. 367.] Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work. [437 U.S. at 589 [98 S.Ct. 2522, 2525], 198 USPQ at 197, *quoting* 409 U.S. at 67 [93 S.Ct. 253, 255], 175 USPQ at 675.]

The Court in *Flook* continued its analysis by stating that "[t]he rule that the discovery of a law of nature cannot be patented rests, not on the notion that natural

phenomena are not processes, but rather on the more fundamental understanding that they are not the kind of "discoveries" that the statute was enacted to protect." 437 U.S. at 593, 98 S.Ct. at 2527, 198 USPQ at 198. The Court did, however, identify certain circumstances wherein claims encompassing natural phenomena define statutory subject matter when it stated "[e]ven though a phenomenon of nature or mathematical formula may be well known, an inventive application of the principle may be patented. Conversely, the discovery of such a phenomenon cannot support a patent unless there is some other inventive concept in its application." *Id.* at 594, 98 S.Ct. at 2528, 198 USPQ at 199.

The invention under consideration in *Flook* is exemplified by claim 1:

1. A method for updating the value of at least one alarm limit on at least one process variable involved in a process comprising the catalytic chemical conversion of hydrocarbons wherein said alarm limit has a current value of

$$Bo + K$$

wherein Bo is the current alarm base and K is a predetermined alarm offset which comprises:

(1) Determining the present value of said process variable, said present value being defined as PVL;

(2) Determining a new alarm base $B_1$, using the following equation:

$$B_1 = Bo(1.0 - F) + PVL(F)$$

where F is a predetermined number greater than zero and less than 1.0;

in either case. In both cases, however, the patents were challenged on the basis that they improperly monopolized natural phenomena. The identified phenomenon in each case was that which made the claimed bacteria valuable to the patentees. In *Funk,* the phenomenon was the mutual non-inhibition of certain bacteria and in *Cameron* the phenomenon was the effect of the bacteria on effluent.

It might be observed that paragraph three of 35 U.S.C. § 112 currently provides for "means plus function" elements as part of so-called

"combination" claims. Although Bond used such a claim form in his patent, the Supreme Court considered the claims to effectively preempt the complete "non-inhibitive" biological function which Bond had discovered in nature. Clearly "means plus function" claims can be patentable even when the function is a naturally occurring one—note Morse's claims 1 and 3, supra—but care must be taken so as not to preclude *all* of the natural phenomenon utilized by the "means" in those claims.

(3) Determining an updated alarm limit which is defined as $B_1 + K$; and thereafter

(4) Adjusting said alarm limit to said updated alarm limit value.

[*Id.* at 596–7, 98 S.Ct. at 2529, 198 USPQ at 200.]

Examining this claim in view of the Court's statements in *Flook* and the cases discussed above makes it clear that the Court considered the allowance of such a claim to be a preemption of the formula or natural principle recited therein because the non-computation steps merely gather values necessary for the computation or employ the computed results in the only manner in which they are useful. The result would be a patent on the principle, i. e., the formula or method of calculation and the Court held that such a method of calculation was not a process within the meaning of 35 U.S.C. § 101. *Id.* at 595, n. 18, 98 S.Ct. 2522, 198 USPQ at 199, n. 18.

In each of the aforementioned cases, the Supreme Court centered its analysis on the phenomenon which made the invention valuable to the inventor and then proceeded to determine whether or not the inventor attempted to preclude others from using those bare phenomena.

So, in the appeals at hand, the initial consideration should be into the respective discoveries and the natural phenomena involved, followed then by an assessment of the scope of the claims with regard to those phenomena.

Considering, first, the Bergy appeal: The invention therein centers on the discovery that certain microorganisms have the distinctly useful property of producing the antibiotic lincomycin. The phenomena involved in making the invention valuable to

the inventor are those only dimly understood, but nevertheless existing, metabolic processes leading to the noted drug. Do Bergy and his coinventors attempt to preempt all others from the biological production of lincomycin? I think it clear that they do not. The claim in issue:

A biologically pure culture of the microorganism *Streptomyces vellosus*, having the identifying characteristics of NRRL 8037, said culture being capable of producing the antibiotic lincomycin in a recoverable quantity upon fermentation in an aqueous nutrient medium containing assimilable sources of carbon, nitrogen and inorganic substances.

is limited to but a single microorganism, which, in its claimed form,[4] does not even occur in nature. Indeed, the Bergy et al. patent application specifically discloses at least four other microorganisms used to biologically produce the drug.

The invention of Chakrabarty revolves around the abilities of certain bacteria to digest or metabolize various hydrocarbon components of crude oil. Again, these capabilities are natural phenomena and occur via complex metabolical processes.

Chakrabarty's broadest claims:

7. A bacterium from the genus *Pseudomonas* containing therein at least two stable energy-generating plasmids, each of said plasmids providing a separate hydrocarbon degradative pathway.

21. An inoculum for the degradation of a pre-selected substrate comprising a complex or mixture of hydrocarbons, said inoculum consisting essentially of bacteria of the genus *Pseudomonas* at least some of which contain at least two stable energy-generating plasmids, each of said

---

4. As adequately demonstrated in affidavits submitted by appellants, this microorganism, in the condition as it is found in Arizona soil, does not produce lincomycin.

Parenthetically, the PTO follows well-established case law in dropping the product-of-nature rejection regarding this claim. Several courts, including this one, have considered the patentability of purified naturally occurring products and found them generally to be within the purview of § 101 or its predecessors. *See*

*In re Bergstrom,* 427 F.2d 1394, 57 CCPA 1240, 166 USPQ 256 (1970) (prostaglandin compounds); *Merck v. Olin Mathieson Chemical,* 253 F.2d 156, 116 USPQ 484 (4th Cir. 1958) and *Merck v. Chase Chemical,* 273 F.Supp. 68, 155 USPQ 139 (D.N.J.1967) (Vitamin B–12); *Sterling Drug v. Watson, Comr. Pats.,* 135 F.Supp. 173, 108 USPQ 37 (D.C.D.C.1955) (1-arterenol); *Parke-Davis v. Mulford,* 196 F. 496 (2d Cir. 1912) (adrenalin).

plasmids providing a separate hydrocarbon degradative pathway.

do not preempt the biological metabolism of hydrocarbons. As in the Bergy et al. application, the microorganisms as claimed by Chakrabarty cannot be found in nature, and the results producible with the claimed microorganism are not duplicated in nature. Also, Chakrabarty points out that a number of the members of the genus *Pseudomonas* have the ability to metabolize specific types of hydrocarbons, and, thus, provide other available means capable of providing (albeit, not as effectively) similar functions.[5]

In sum, it seems quite clear that the claims in both of these appeals do not reach out to encompass natural phenomena as did Morse's claim 8 or the claims in *Funk,* but rather recite only *non-naturally occurring* compositions of matter that are but single tools for utilizing natural phenomena in producing new and useful end results.

Having completed the task suggested by the Supreme Court in its remand, a few general comments are in order.

The PTO argues[6] that "without a 'clear and certain' signal that it [Congress] intended living organisms—not to mention microorganisms—to be patentable subject matter under 35 USC 101," we should not attempt to extend the scope of that section. As should be apparent from my earlier comments, supra n. 1 and accompanying text, I do not view the patenting of microorganisms[7] as an extension of the broadly intended § 101 as long as the scope of the patent

monopoly does not fall within the areas proscribed by the Supreme Court in the cases discussed above.

Finally, the Plant Patent Act appears to voice both the recognition and the reaction of Congress to the fact that some new varieties of plants were no longer merely products of nature, but were also the products of man. The House Report on the Plant Patent Act evidences this Congressional recognition in stating:

[A] plant discovery resulting from cultivation is unique, isolated, and is not repeated by nature, nor can it be reproduced by nature unaided by man, and such discoveries can only be made available to the public by encouraging those who own the single specimen to reproduce it asexually and thus create an adequate supply.

It is obvious that nature originally creates plants but it can not be denied that man often controls and directs the natural processes and produces a desired result. In such cases the part played by nature and man can not be completely separated or weighed or credited to one or the other. Nature in such instances, unaided by man, does not reproduce the new variety true to type.[8]

A memorandum from the Commissioner of Patents, then Thomas E. Robertson, to the Secretary of Commerce, R. P. Lamont, shows that it was this difficulty in providing sufficient description of to-be-patented plants, and not the fact that plants are alive

---

5. Chakrabarty discloses that bacterial mixtures have been used to metabolize crude oils. However, because of the disparate nutritional requirements and growth rates of the component single-plasmid species, the effectiveness of these mixtures was not exceptional. By providing multiple plasmids in the single microorganism, Chakrabarty obviates these problems.

 This improvement in effectiveness and my view that living things are patentable (*see* n. 3, supra) now lead me to the conclusion that even under the analysis provided in *American Fruit Growers, Inc. v. Brogdex Co.,* 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801, 8 USPQ 131 (1930), the claimed microorganism is a "manufacture" within the meaning of the statute.

6. Supplemental brief of the PTO, citing *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S.

518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273, 173 USPQ 769, 774 (1972).

7. As a practical matter, I do not foresee the patenting of higher forms of life because of the inherent difficulty in complying with the enablement provisions of 35 U.S.C. § 112, paragraph one. Microorganisms are probably a special case because of their ease of description, *see In re Argoudelis,* 434 F.2d 1390, 58 CCPA 769, 168 USPQ 99 (1970), and the apparent availability of samples of the microorganisms, themselves, from one of the various culture depositories.

8. H.R.Rep.No.1129, 71st Cong., 2d Sess. 7 (1930).

which precluded their patenting under the then-current statute:

Further, and more important, there at once arises the difficulty of defining in a written document which must be printed, both as constituting part of the patent and as constituting a publication available for search and distribution, the differences which identify a new variety from previously known varieties. For example, if that difference exists only in the color of the bloom, then in order to describe that difference it would seem that a colored print of some sort would have to constitute a part of the patent.

If it is not possible by ordinary description of the physical qualities of the plant, or the fruit, or the bloom, or all three, to so accurately define this new variety that it can be differentiated from all known varieties and from all subsequently created new varieties, then it is difficult to see how a patent to be granted would comply with the other provisions of the statutes, namely, that the inventor must describe his invention in full, clear, concise, and exact terms. (R.S. 4888.)

In other words, section 4888, Revised Statutes, requires one who obtains a patent to file in the Patent Office "a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same."

In many instances (if not all) it may be found that no description could be written that would enable any one to identify so as to reproduce from that description (without the extraneous aid of physical cuttings or slips grafted in accordance with the usual methods) the new variety, as the only way asexually reproduced varieties can be reproduced is from a physi-

cal cutting or slip from the new variety itself. To state the matter in another way, if after the new variety were produced, and then reproduced asexually, an application for patent was filed with the most explicit description that it is possible to furnish, and all the plants containing such a new species were destroyed, as for example by fire, then there would be no way whatever of reproducing this new species. The written, description filed in the Patent Office would be useless and hence could not satisfy the conditions of section 4888, Revised Statutes.[9]

The reaction of Congress was the relaxation of the description requirement as a means for constitutionally "promoting" the "useful art" of plant breeding. The bill, as passed, included the provision "[n]o plant patent shall be declared invalid on the ground of noncompliance with this section [§ 4888—35 USC 33 (1930)] if the description is made as complete as is reasonably possible."

Additionally, both the Senate and the House directly considered the question of the constitutionality of granting patents on plants and both concluded:

[T]he amendments to the patent laws proposed by the bill fall within the legislative power of Congress under Article I, section 8, of the Constitution—

\* \* \* \* \* \*

There can be no doubt that the grant of plant patents constitutes a promotion of "the progress of science and useful arts" within the meaning of the constitutional provision.[10]

In sum, the legislative history of the Plant Patent Act, and its virtual lack of constitutional challenge throughout the following 50 years demonstrate that living things are patentable under the Constitution. The intended breadth of § 101 provides a similar conclusion under the Patent Act of 1952 if the statutory description requirements can be satisfied. Finally, my examination of the claimed inventions re-

9. A Bill to Provide for Plant Patents: Hearings on H.R. 11372 before the Comm. on Patents, 71st Cong., 2d Sess. 7 (1929–30) (statement of Hon. Fred S. Purnell).

10. H.R.Rep.No.1129, 71st Cong., 2d Sess. 7 (1930); S.Rep.No.315, 71st Cong., 2d Sess. 6 (1930).

veals them to be exterior to the judicially defined areas of *un* patentable subject matter. Accordingly, I would reverse the decisions of the board.

MILLER, Judge, dissenting.

I do not share the majority's conclusion that the Supreme Court's opinion in *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451, 198 USPQ 193 (1978), sheds no light on these cases. By concentrating on the literal statements of the Court, including the Court's quotation from its opinion in *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273, 173 USPQ 769, 774 (1972), the majority has missed the essential thrust of the Court's opinion that, recognizing that Congress could not foresee all new developments in technology and that 35 U.S.C. § 101 should be broadly construed, *where there is a basis for substantial doubt over the intent of Congress* regarding the breadth of the language in the statute, the Court will await a "clear and certain signal from Congress" on the subject.

I submit that a basis for substantial doubt, at least, exists over whether organisms (or microorganisms) developed by inventors were intended by Congress to be embraced by the words "manufacture" or "composition of matter." Previously stated[1] are my reasons for believing that the Plant Patent Act of 1930 [ch. 312, 46 Stat. 376] and the Plant Variety Protection Act of 1970 [84 Stat. 1542], along with their accompanying legislative history, clearly establish that Congress did *not* intend that *any* organisms (which would include microorganisms), other than the plants[2] covered by those Acts, be within the scope of 35 U.S.C. § 101.

If Congress intended otherwise, there would have been no need to enact such legislation, and there is a basic presumption that Congress does not legislate unnecessarily. *See Platt v. Union Pacific Railroad,* 99 U.S. 48, 58, 25 L.Ed. 424 (1878); *In re Finch,* 535 F.2d 70, 71, 190 USPQ 64, 65 (Cust. & Pat.App.1976); *United States v. C. J. Tower & Sons,* 44 CCPA 1, 5, C.A.D. 626 (1956); *Skovgaard v. The M/V Tungus,* 252 F.2d 14, 17 (CA 3 1957), *aff'd,* 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); *United States v. Korpan,* 237 F.2d 676, 680 (CA 7 1956), *rev'd on other grounds,* 354 U.S. 271, 77 S.Ct. 1099, 1 L.Ed.2d 1337 (1957). Both the majority and concurring opinions fail to point to anything that would rebut that presumption.

The majority and concurring opinions stress *one* aspect of the 1930 Act, namely: under then-existing law it was not seen how a plant could be described in a written document to comply with the "written description" requirement of section 4888 of the Revised Statutes (now 35 U.S.C. § 112), and so the substance of what is today the first sentence of 35 U.S.C. § 162 was added to the law. However, this addition to the law was merely ancillary to the extension of the patent law to plant inventions by the provision of what is today 35 U.S.C. § 161 ("Patents for Plants"). And it is to this extension of the patent law that the above-stated basic presumption applies—a point which the majority and concurring opinions fail to address. The 1930 Act amended section 4886 of the Revised Statutes to read:

> Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, <u>or who has invented or discovered and asexually reproduced any distinct and new variety of plant, other than a tuber-propagated plant</u> . . . may, upon payment of the fees required by

1. In my dissenting opinions in *In re Chakrabarty,* 571 F.2d 40, 45, 197 USPQ 72, 76 (Cust. & Pat.App.), *cert. dismissed sub nom. Banner v. Chakrabarty,* —— U.S. ——, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978), and in *In re Bergy,* 563 F.2d 1031, 1039, 195 USPQ 344, 351 (Cust. & Pat. App.1977), *vacated and remanded sub nom.*

*Parker v. Bergy,* 438 U.S. 902, 98 S.Ct. 3119, 57 L.Ed.2d 1145, 198 USPQ 257 (1978).

2. As defined by Webster's *Third New International Dictionary* 1731 (unabr. 1971), a plant is "any of numerous *organisms* constituting the kingdom Plantae." (Emphasis added.)

law, and other due proceeding had, obtain a patent therefor. [Additional matter underscored.]

Section 4892 of the Revised Statutes was amended to read:

The applicant shall make oath that he does verily believe himself to be the original and first inventor or discoverer of the art, machine, manufacture, composition, or improvement, <u>or of the variety of plant,</u> for which he solicits a patent; that he does not know and does not believe that the same was ever before known or used; and shall state of what country he is a citizen. [Additional matter underscored.]

The 1930 Act also amended section 4884 of the Revised Statutes, singling out asexually reproduced plants for patent protection. If Congress had intended the words "manufacture" or "composition of matter" in sections 4886 and 4892 of the Revised Statutes and their predecessors to embrace organisms (or microorganisms), enactment of the above amendments would have been unnecessary. The same basic presumption applies with respect to enactment of a 1954 amendment to Section 161 (ch. 1259, 68 Stat. 1190)[3] and with respect to enactment in 1970 of the Plant Variety Protection Act. Thus, the majority and concurring opinions are forced into the untenable position of maintaining that Congress—not once, but thrice—enacted needless legislation.[4]

The majority opinion emphasizes that the Plant Patent Act was concerned only with plants. This completely misses the point. If section 4886 of the Revised Statutes did, indeed, embrace organisms (and microorganisms), then why would Congress needlessly legislate coverage for organisms known as "plants"?

In both the House and Senate Committee Reports accompanying the bills that became the Plant Patent Act,[5] after quoting from the then-existing patent laws as applying to "any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof," the following statement appears:

There is a clear and logical difference between the discovery of a new variety of plant and of certain *inanimate* things, such, for example, as a new and useful natural mineral.

．　　　．　　　．　　　．　　　．

Furthermore, there is no apparent difference, for instance, between the part played by the plant originator in the development of new plants and the part played by the chemist in the development of new compositions of matter which are patentable under existing law. Obviously, these new compositions of matter do not come into being solely by act of man. The chemist who invents the composition of matter must avail himself of the physical and chemical qualities inherent in the

---

3. The purpose of this amendment was to "remove any doubt that the legislative intent of the Congress clearly means that sports, mutants, hybrids, and seedlings, discovered by persons engaged in agriculture or horticulture, should be patentable." H.R.Rep. No. 1455, 83d Cong., 2d Sess. (1954); S.Rep. No. 1937, 83d Cong., 2d Sess. (1954), U.S.Code Cong. & Admin.News 1954, p. 3981.

4. Both the Senate Judiciary Committee report (S.Rep. No. 91–1246, 91st Cong., 2d Sess. 3 (1970)) and the House Committee on Agriculture report (H.R.Rep. No. 91–1605, 91st Cong., 2d Sess. 1, U.S.Code Cong. & Admin.News 1970, pp. 5082, 5083 (1970)) accompanying the bill (S. 3070) which became the Plant Variety Protection Act stated:

Under patent law, protection is presently *limited* to those varieties of plants which re-

produce asexually, that is, by such methods as grafting or budding. *No* protection is available to those varieties of plants which reproduce sexually, that is, generally by seeds. Thus, patent protection is *not* available with respect to new varieties of most of the economically important agricultural crops, such as cotton or soybeans. [Emphasis added.]

Thus, the Patent Act of 1952, as amended in 1954, was considered to cover only plants falling under 35 U.S.C. § 161, and 35 U.S.C. § 101 was obviously considered to cover no plants or other organisms whatsoever.

5. H.R.Rep. No. 1129, 71st Cong., 2d Sess. 7–8 (1930); S.Rep. No. 315, 71st Cong., 2d Sess. 6–8 (1930).

materials used and of the natural principles applicable to matter. . . . The same considerations are true of the plant breeder. He avails himself of the natural principles of genetics and of seed and bud variations.

. . . . .

But even were the plant developer's contributions in aid of nature less creative in character than those of the chemist in aiding nature to develop a *composition of matter* which has theretofore been nonexistent . . . *nevertheless the protection by patents of those engaged in plant research and discovery would not be beyond the constitutional power of Congress.* [Emphasis added.]

Thus, Congress recognized the dichotomy of animate and inanimate inventions and decided to extend patent protection for animate inventions, but only to asexually reproduced plants.[6] The nature of organisms, whether microorganisms, plants, or other living things, is fundamentally different from that of inanimate chemical compositions.

Accompanying the hearings on the proposed plant patent legislation was a letter from the Commissioner of Patents expressing some doubt over the constitutionality of providing for a patent grant on a new plant variety, when the plant is reproduced by operation of nature, aided only by the act of the patentee in grafting it by usual methods. The committee reports, stating that "the protection by patents of those engaged in plant research and discovery would not be beyond the constitutional power of Congress," show that Congress did not share the Commissioner's doubt.[7] The Commissioner's recommendation that the legislation take the form of a supplement to section 4886 was not adopted, as can be seen from the amended sections 4886 and 4892 quoted earlier in this opinion.

It is true that, as the majority opinion states, the Plant Patent Act was enacted *after* section 4886 of the Revised Statutes had been enacted, and that this is not as strong evidence of Congressional intent underlying section 4886 as contemporaneous enactment would have been. However, such subsequently enacted legislation is, nonetheless, entitled to "great weight in statutory construction." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Glidden Co. v. Zdanok,* 370 U.S. 530, 541, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). More importantly, when the patent law, including section 4886, was codified by the Patent Act of 1952 [ch. 950, 66 Stat. 792] into title 35 of the United States Code, the statutory law, judicial precedent, and legislative intent (including that expressed in connection with the Plant Patent Act of 1930) were all carried forward into the codification.[8] *See Fourco Glass Co. v. Transmirra Corp.,* 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); 82 C.J.S. *Statutes* § 276 (1953). *See also Muniz v. Hoffman,* 422 U.S. 454, 469, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975). As well stated in 1A Sands, *Sutherland Statutes and Statutory Construction* § 28.10 at 327 (4th ed. 1972):

In case of ambiguity it is permissible to resort to the prior legislative history of the act, the form and language of the prior statute, prior interpretation, other legislation in pari materia and *all pertinent aids to statutory construction in order to arrive at the true meaning of the code provision.* [Footnote omitted.]

The majority and concurring opinions refer to a comment in the committee reports accompanying the bill that became the Patent Act of 1952, that, with reference to

---

**6.** *See In re LeGrice,* 301 F.2d 929, 939, 49 CCPA 1124, 1139, 133 USPQ 365, 374 (1962).

**7.** The same doubt was expressed by the Commissioner regarding the 1954 amendment to section 161, *supra.* This was rejected in the accompanying committee reports, *supra* note 3, which stated that "the committee is of the

opinion that this type of legislation does have constitutional basis for its enactment."

**8.** It should be noted that no such carryover of legislative intent into a codification was present in *Rainwater v. United States,* 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958), cited in the majority opinion.

**1002**

section 101, "a machine, or a manufacture . . . may include *anything under the sun that is made by man.*" (Emphasis added.) However, they neglect to point out that this must be read in light of the *later* comment that the "next chapter collects the provisions relating to plant patents," which in itself indicates that "anything under the sun that is made by man" is not to be taken literally.[9] This court assuredly did not take the comment literally in its opinion ten years later in *In re LeGrice, supra* 301 F.2d at 939, 49 CCPA at 1139, 133 USPQ at 374, which recognized that under the Plant Patent Act of 1930—

> The patent law, as shown by the Committee Reports, was *extended* to plant patents in order to stimulate interest in the breeding and commercial development of new and valuable plant species. [Emphasis added.]

If the patent law prior to the Patent Act embraced organisms, there would have been no reason for *extending* it to plant inventions.

The majority opinion says:

> In short, we think the fact that microorganisms are alive is a distinction without legal significance and that they should be treated under § 101 no differently from chemical compounds.

> . . . we do not see the logic of allowing claims to processes which depend for their operation on a living organism while denying claims to the organism or a pure culture of it *merely* because it is alive.

Those are arguments to be presented to the Congress—not to the Court.[10] Then, perhaps, a "clear and certain signal" will come from the Congress, which assuredly has the

constitutional power to extend the patent law to organisms other than plants. As well articulated by Chief Judge Markey in his concurring opinion in *In re McKellin,* 529 F.2d 1324, 1333, 188 USPQ 428, 437 (Cust. & Pat.App.1976):

> [T]he patent law is statutory. Our representative form of government requires that the enactments of its Congress must always be, at the very least, the starting point. There being no common law of patents, we should take care to fill the Holmesian interstices of the statute with judge-made law only under the gravest and most impelling circumstances.

For the above reasons and others set forth in my dissenting opinions referred to earlier, the decisions of the board should be affirmed.

---

9. The approach of the majority opinion here appears to be of the kind that Justices Jackson and Frankfurter (quoted in the majority opinion) criticized.

10. The majority opinion points to a *few* instances over the years when, among the hundreds of thousands of patents issued, the Patent and Trademark Office has granted patents to organisms or microorganisms. There is no

evidence that these were ever brought to the attention of Congress. *Cf. Natural Resources Defense Council, Inc. v. NRC,* 582 F.2d 166, 171–72 (CA 2 1978), and citations therein. The Commissioner's actions in the cases before us clearly indicate his position that the grant of such patents arose from administrative error, and there is no showing that such administrative error formed a consistent pattern.